CLIFFORD SANDERS *v.* THE STATE.*

*(Nashville.* December Term, 1924.)

1. **HOMICIDE.** Evidence held not to support self-defense theory, but to warrant finding accused was "lying in wait" for certain person.

   Evidence, in prosecution for assault with intent to commit murder, *held* not to support self-defense theory, but to warrant finding accused. was "lying in wait" for certain person. (*Post, p.* 458.)

2. **HOMICIDE.** Evidence held to support conviction for assault with intent to commit murder in the first degree.

   Evidence *held* to support conviction for assaulting prosecuting witness by shooting him, with intent to commit murder in the first degree. (*Post, p.* 458.)

3. **HOMICIDE.** Accused, who lay in wait for certain person, but who shot at another thinking latter was person sought, held guilty of assault with intent to commit murder in first degree.

   Accused, who lay in wait for certain person, but who shot at another thinking latter was person sought, *held* guilty of assault with intent to commit murder in first degree. (*Post, pp.* 458-463.)

   Case cited and approved: Bratton v. State, 29 Tenn., 106.

   Cases cited and distinguished: Kannon v. State, 78 Tenn., 389; Riley v. State, 28 Tenn., 660..

---

*Headnotes 1. Homicide, 30 C. J., Section 556; 2. Homicide, 30 C. J., Section 562; 3. Homicide, 30 C. J., Section 167.

FROM DAVI))SON.

---

*On homicide by unlawful act aimed at another than the one killed, see note in 63 L. R. A. 660.

On assault with intent to murder or kill by unlawful act aimed at another than the one injured, see note in 37 L. R. A. (N. S.) 172.

Sanders v. State.

Appeal from the Criminal Court of Davidson County. —Hon. CHESTER K. HART, Judge.

JEFF McCARN, for Sanders.

W. H. SWIGGART, JR., Assistant Attorney-General, for the State.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

Clifford Sanders, referred to herein as the defendant, was convicted for an assault with intent to commit murder in the first degree, and the jury fixed his maximum punishment at confinement in the penitentiary for five years.

The defendant has appealed to this court and has assigned numerous errors, his principal insistence being that the evidence is insufficient to sustain the conviction.

The defendant, with his wife, her two sisters, and their husbands, Leslie Marshall and Albert Powell, resided in a four-room cottage which set back some two hundred feet from Hamilton road in Davidson county. Hamilton road runs east and west, and the house is on the north side of the road facing south.

On the night of January 17, 1924, the defendant came home in an intoxicated condition, and had a fuss with his wife, or some other member or members of the household. The evidence is not very clear as to just what did occur. The defendant procured his double-barrel shotgun, a sack of shells, and his pistol, and went out into the yard, where he engaged in swearing, loud talking, and shot his gun one time. His brother-in-law Powell remonstrated with him, and told him, in substance, to return to the house and behave himself, to which he

replied: "That is all right; I am not scared of anybody." Powell then told the defendant that if he did not come into the house he would have to have it stopped.

Subsequently Powell left the house to summon the officers, taking his departure through a back window so that he would not be observed by the defendant.

In the meantime, according to the testimony of the defendant, he went to the barn, which was west of the house, and fed his stock, and then returned and seated himself on the west side of the house, where he remained until the officers came some two hours later.

It appears that about a year previous the defendant and his brother-in-law Leslie Marshall had a shooting scrape, during which each shot the other. Since that date they had not spoken, although continuing to occupy the same house.

While the defendant was in the yard, in front of the house, he looked through the window and saw Marshall load his gun. He admits that no words passed between them, and that Marshall made no threats of any kind toward him, or offered to do him any violence.

Marshall testified that he loaded his gun every night before retiring to protect his home.

The officers arrived between eleven and twelve o'clock in an automobile. They came from the west, had their lights on, and drove thirty-five or forty yards past the front gate, where they stopped. They entered the gate and walked on up to the house laughing and talking on the way.

The defendant could see the gate from where he was seated.

The officers were advised that the defendant was somewhere out in the yard. Officer Sanders picked up Mar-

shall's gun, came out into the yard in search of the defendant, and started around the house in a westerly direction. When he had taken four or five steps past the southwest corner of the house, the defendant shot him, inflicting serious wounds.

The defendant testified that he was sober at the time, and that the moon was shining, but that it was cloudy.

Sanders testified that when he turned the corner of the house he saw the defendant standing behind some bushes; that it was light enough for him to see that he was a negro; that he called to the defendant and asked him what the trouble was, whereupon the defendant immediately fired. He further testified that he was holding the gun down in one hand, probably the left hand, and did not raise the gun to a shooting position, or make any demonstration with it.

The defendant testified that he did not see the automobile; did not see the officers enter the gate and walk up to the house; did not hear them talking and laughing; that he was not standing behind any bushes; and that it was not light enough for him to tell that Officer Sanders was a white man.

The southwest corner of the house was some four feet off of the ground. The defendant further testified that he looked under the house and saw Mr. Sanders coming around the house with a gun in his hand, but that he thought it was Marshall; that the gun was "thrown on him," and he shot because he thought Marshall was going to shoot him.

After the defendant shot Officer Sanders, he ran away. Bloodhounds were dispatched to the scene of the shooting, and, after trailing the defendant through weeds

and water for three or four miles, he was found at the home of a friend by the name of Will Scales.

The proof showed that the bushes where the defendant was standing at the time he fired the shot were tramped down, indicating that the defendant had been standing at that point for some time.

Ed Harris and Joe Dickson testified that after the defendant was placed in jail he stated to them that he shot the first man he saw walk around the corner, and that he was there to shoot the first man around the corner.

Accepting the defendant's theory that he thought he was shooting Marshall, we are of the opinion that the evidence is sufficient to sustain the conviction.

The preponderance of the evidence does not support the defendant's self-defense theory. The jury were well warranted in finding that he was "lying in wait" for Marshall.

· But it is insisted that, although this be true, he could not be guilty of murder in the first degree had he killed Sanders, for the reason that he thought he was shooting Marshall, and we are referred to the case of *Bratton* v. *State,* 10 Humph., 106, in which it was held that if the defendant, intending to kill the prosecutor, where the killing would have been murder in the first degree, killed the wife of the prosecutor, the offense would not be murder in the first degree.

In 29 Corpus Juris, 1109, it is said:

"It is not ordinarily necessary under the statutes defining murder in the first degree that the specific intent to kill be directed toward the person actually killed, and the crime is as a general rule of the first degree if with the specific intent to kill one person defendant by accident or mistake killed another, or if, with the formed

design of killing some one, although with no definite per-son in mind, he shot and killed a person whom he did not know, the underlying rule being that where an act directed toward one person results in the unintentional killing of another, the degree of criminality is the same as if the person toward whom the act was directed had been the victim.''

Many cases are cited in the notes in support of the text, and *Bratton* v. *State,* supra, is the only case cited to the contrary.

In *Kannon* v. *State,* 10 Lea, 389, the court, in commenting upon the Bratton Case, said:

"This decision leads to the curious anomaly under the statute, that while murder committed in an attempt to perpetrate larceny, is murder in the first degree, yet the murder of one person in an attempt to commit murder in the first degree on another, would not be murder in the first degree. The result is, however, due to the elements required by the statute to constitute murder in the first degree, and the specific enumeration of crimes in the perpetration of which murder in the first degree may be committed. The statute is the creature of legislation, and the courts must abide by its terms.''

But the Bratton Case, properly understood, is an authority against the defendant. In that case, in interpreting our statute defining murder in the first degree, the court said:

"In cases of murder by means of poison, or lying in wait, the most atrocious and detestable of all kinds of homicide, and the least to be guarded against, either by resistance or forethought, the crime is made to depend exclusively upon the 'means' causing death. So, likewise, in respect to cases of murder committed in the

perpetration of, or attempt to perpetrate arson, rape, robbery, burglary or larceny; a class of felonies most dangerous in their consequences to public safety and happiness, which may be most frequently and easily committed, and to which there are the strongest temptations. In all these cases, the mode or 'means' of destroying life, supplies a conclusive legal presumption of malice and guilty intention; the crime, as well as the legal guilt of the agent, is made to depend alone upon the fact of taking life in either of the specified modes. In such cases, the question of malice or intention, as a matter of fact, is wholly irrelevant; it need not be proved, and cannot be controverted by the accused. But the remaining species of murder defined in the statute, namely, murder 'by any other kind of willful, deliberate, malicious and premeditated killing,' falls within the operation of a directly contrary principle. Here, the character of the crime and guilt of the agent, are made to depend exclusively upon the mental status, at the time of the act, and with reference to the act which produces death.

"This accumulated definition of murder in the first degree, takes in all the ingredients of crime descriptive of the utmost malignity and wickedness of heart, as well as of the highest and most aggravated species of homicide. If the universal principle of construction is to be regarded, that every word in a statute is to have meaning and effect given to it, if practicable, it results of necessity, by force of the terms employed in the definition of the crime, that to constitute murder in the first degree, it must be established, that there existed in the mind of the agent, at the time of the act, a specified intention to take the life of the particular person

slain. The characteristic quality of·this crime and that which distinguishes it from murder in the second degree, is the existence of a settled purpose and fixed design on the part of the assailant, that the act of assault should result in the death of the party assailed; that death, being the end aimed at, the object sought for and wished. 4 Humph., 136, 139. The 'killing' must be willful; 'that is, of purpose, with intent that the act, by which the life of a party is taken, should have that effect.' 10 Yerg., 551. 'Proof must be adduced to satisfy the mind, that the death of the party slain was the ultimate result which the concurring will, deliberation and premeditation of the party accused sought.' 1 Leigh's Rep., 611.

"If then, by misadventure or other cause, a blow, directed at a particular person and designed to take his life take effect upon and cause the death of a third·person, against whom no injury was meditated, can it be said, that the will concurred with the act, which resulted in the accidental death of such third person; or that there existed a specific intention to take his life. A grosser absurdity cannot be conceived."

The facts in that case evidently brought it within the latter provision of the act, viz. murder "by any other kind of willful, deliberate, malicious and premeditated killing." In such case a specific intention to take the life of the particular person slain must have existed in the mind of the slayer. This is not true where the homicide results from "lying in wait." In such case the question of malice or intention is implied, and need not be proved and cannot be controverted by the accused. Such is the express holding in the Bratton Case. The court was following its previous holding in the case of *Riley*

v. *State*, 9 Humph., 660, where the murder was committed by lying in wait, and in the opinion the court, speaking through Judge GREEN, said:

"It is insisted for the prisoner, that although the fact of murder 'by poison or lying in wait,' shall be established, it will not be murder in the first degree under the statute, unless it also be made to appear, that the act was done willfully, deliberately, maliciously and premeditatedly; that the words 'by means of poison, lying in wait, or any other kind of willful, deliberate, malicious and premeditated killing,' are to be construed as though the legislature had said, 'If any person shall, by lying in wait, willfully, deliberately, maliciously, and premeditatedly kill another, it shall be murder in the first degree.' The argument is, that the State must establish the willful, deliberate, malicious and premeditated character of the act, independent of, and as though the lying in wait did not exist in the case. This, we think, would be an erroneous construction of the act. For if the construction contended for were correct, the lying in wait would contribute nothing towards the establishment of the guilt of the party, except as a fact going to show the willful and deliberate nature of the act; but it would be a fact which might be weakened, and its influence done away by other evidence. Such is not the meaning of the statute. The sum of the statute is this: In cases of murder by ordinary means, the circumstances of the transaction must show, that it was done willfully, deliberately, maliciously and premeditatedly, or it is not murder in the first degree; but if murder be perpetrated by poison, or lying in wait, it shall be murder in the first degree. The fact of lying in wait, shall of itself, be evi-

dence of a willful, deliberate, malicious and premeditated purpose. If it be proved that the killing was of such character, that under ordinary circumstances it would have been murder at common law, and the fact of lying in wait exist, that fact will make it a case of murder in the first degree, under the statute. Where a lying in wait is established, all proof as to 'intention' or 'willfulness' is irrelevant, if the stroke be given under circumstances that would make it murder at common law. If a party strike with a deadly weapon, without provocation, intending to inflict the stroke, as a matter of law, which he cannot dispute, he shall be held to intend the consequences; and if death ensue, it is murder. And in such cases, if a lying in wait exist, it is murder in the first degree.''

In 29 Corpus Juris, 1117, it is said:

''Where killing in the perpetration or attempt to perpetrate a felony or one of certain enumerated felonies is made murder in the first degree, the perpetration or attempt to perpetrate the felony is regarded as standing in the place of or as the legal equivalent of the willfulness, deliberation, and premeditation necessary under the statute as to other killings and dispenses with the necessity of proof thereof.''

The rule is the same, of course, where the homicide is by ''poison'' or ''lying in wait.''

We have considered the various assignments of error and find them all without merit.

It results that the judgment of the trial court will be affirmed.