SULLIVAN *v.* STATE.

(*Knoxville*, September Term, 1938.)

Opinion filed November 25, 1938.

C. E. KEYES and G. M. DECK, both of Crossville, for plaintiff in error.

W. F. BARRY, JR., Assistant Attorney-General, for the State.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

Wilker Sullivan, referred to herein as the defendant, has appealed to this court from a conviction for murder in the first degree, with a prison sentence of ninety-nine years.

Omitting the formal parts of the indictment, it charges that "Wilker Sullivan, heretofore, on or about the 21st day of October, 1937, in the County and State aforesaid, did unlawfully, feloniously, willfully, maliciously, deliberately, premeditatedly and of his malice aforethought assault one Hattie Sullivan with a dangerous and deadly shotgun, loaded, and did then and there shoot, wound, kill and murder the said Hattie Sullivan and did so commit murder in the first degree upon the body of the said Hattie Sullivan, against the peace and dignity of the State."

The facts of the case are few and undisputed. The defendant did not testify upon the trial of the case and introduced no evidence in his behalf.

Noah Sullivan, an older brother of the defendant and husband of Hattie Sullivan, testified that the defendant

was thirty-two or thirty-four years of age, and during the months of June and July, 1937, he had been away from home in the State of Ohio. Defendant returned to Cumberland County on August 4, and took up his residence on the Hodges farm about 400 yards from the home of Noah Sullivan.

On the afternoon of August 21 defendant armed himself with a single-barreled, breech-loading shotgun and some high-powered shells, and walked to the home of his brother Noah, stopping just outside the front gate, which is 20 or 30 feet from the house, and called Noah out to the gate. When Noah got within 10 or 12 feet of defendant, according to the undisputed testimony of Noah, the following occurred:

"Q. What was the next thing said after you had gotten into the yard? A. Got to the gate?

"Q. Yes. A. He says, 'Noah, who's doing this clearing here?'

"Q. Did you know at that time what piece of land he was referring to? A. Yes sir.

"Q. What did you tell him in response to that question? A. I said 'I'm having the boys clear this off of a few sprouts.'

"Q. In referring to the boys, were you referring to your son? A. My son and my wife's brother.

"Q. Did they live with you and work with you? A. Yes sir.

"Q. Then what did he say after that? A. He asked me who was doing this clearing here and I says, 'I'm having the boys do a little sprouting' and he says 'I want them to stay off my land;' I says, 'Why, Wilker, this here's my land, I've got a deed for it;' he says, 'Who

gave you a deed for it?' I says 'My Dad' and he says 'You're a God damn liar' and throwed down and shot.

"Q. Were you at that time inside of your yard? A. Yes sir.

"Q. Had the gate been opened? A. There had been a gate there but we had nailed slats across up to something like two and a half feet high.

"Q. At the time he raised his shotgun, did he say anything else? A. Never said anything else after he said I was a 'God damn liar.'

"Q. What did he do? A. He shot.

"Q. Did it hit you? A. Yes sir.

"Q. Where? A. In the right arm.

"Q. Did you lose that right arm from that shot? A. Yes.

"Q. It's been amputated at the shoulder there? A. Yes sir.

"Q. Now, at the time he shot you in the arm, state what took place next? A. When he shot me in the arm, I whirled around and turned around and said 'Lord have mercy, Wilker, you have shot my arm off' and when I turned around my wife was behind me some three to six feet and I didn't know she was there and when I whirled around and I seen the blood running down her face, she stood there something like three or four seconds and pitched over on her right side with her face back towards the house; I called her name three or four times and she never made me no answer.

"Q. How long did she stand before she fell? A. Something like three or four seconds, a very short time.

"Q. Did your wife ever speak to you after you turned? A. She never did and I called her by name two or three different times.

"Q. About how far behind you was your wife? A. Somewhere from four to six feet, not very far.

"Q. Any obstacle between Wilker Sullivan, where he was at that time, and your wife? A. Nothing, only that about two and a half foot fence and my arm.

"Q. Was the yard clear where you could see? A. Yes, on the inside and out.

"Q. How, after your wife fell, how long did you stay there? A. When I called her I wanted to get off from her and I walked somewhere from twenty to thirty feet further down to the right of my house.

"Q. After you started walking off, were you going away from the defendant or in what direction were you going? A. I was going away from her.

"Q. What took place after that? A. After I got started from 20 to 30 feet, he shot again."

Mrs. Hattie Sullivan only lived five or ten minutes, the doctor testifying that she died from wounds in her face, neck and breast when shot by the defendant. Noah Sullivan was unable to tell where the second shot struck. Noah was carried to the hospital where his arm was amputated at the shoulder. The record does not show any animosity on the part of the defendant toward Mrs. Hattie Sullivan; and it is the theory of the defendant that he was shooting at his brother and unintentionally killed his sister-in-law. After the homicide the defendant fled some 40 or 50 miles to Rhea County, where he was apprehended by the officers two weeks later.

The principal assignment of error in behalf of defendant complains of the following statement in the court's charge:

"If you find beyond a reasonable doubt, from the proof, that the defendant shot and killed Hattie Sulli-

van while he was attempting to perpetrate or commit murder in the first degree upon the body of Noah Sullivan, as murder in the first degree is herein defined to you, he would be guilty of murder in the first degree, or such degree of felonious homicide as you may find justified by the proof in the light of these instructions.''

Prior to the adoption of the Code of 1932, a homicide committed under the foregoing circumstances would not be murder in the first degree. *Bratton* v. *State,* 29 Tenn. (10 Humph.), 103. With respect to the *Bratton Case* this court, in *Kannon* v. *State,* 78 Tenn. (10 Lea), 386, 389, made this observation: ''This decision leads to the curious anomaly under the statute, that while murder committed in an attempt to perpetrate larceny, is murder in the first degree, yet the murder of one person in an attempt to commit murder in the first degree an another, would not be murder in the first degree.''

In *Sanders* v. *State,* 151 Tenn., 454, 270 S. W., 627, authorities were cited to show that the Bratton Case was out of harmony with the decisions in the other States. To cure this defect in our statute the Legislature, in the Code of 1932, section 10768, amended same so that it now reads:

''Every murder perpetrated by means of poison, lying in wait, or by any other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, *any murder in the first degree,* arson, rape, robbery, burglary, or larceny, is murder in the first degree.''

 We have italicized the words added to the statute by the 1932 Code. It follows that, under the statute as thus amended, when the defendant shot and killed Hattie Sullivan while he was attempting to perpetrate or

commit murder in the first degree upon the body of Noah Sullivan he committed murder in the first degree. And the attempt to commit murder in the first degree upon Noah Sullivan supplies the elements of deliberation and premeditation; so that the State did not have to show deliberation and premeditation on the part of defendant to take the life of deceased.

We are further of the opinion that the evidence is sufficient to constitute murder in the first degree had defendant killed his brother Noah.

■ The criticism directed at the above excerpt of the charge is predicated upon the failure of the indictment to allege that defendant shot deceased while he was attempting to commit murder in the first degree upon the body of Noah Sullivan. Counsel cite no authority in support of this contention. The great weight of authority is to the contrary. In 30 C. J., 98, it is said:

"In Perpetration of Another Offense. Where the homicide is committed in the perpetration of or attempt to perpetrate a felony, it is ordinarily held that an indictment in the ordinary form for murder or for murder in the first degree is sufficient without averment of the connected felony."

Mr. Wharton in his work on Homicide, pp. 875, 876, states the rule and the basis thereof as follows:

"Necessity of charging collateral felony.—At common law it was not necessary to charge in an indictment for murder that the murder was committed in the perpetration of another crime, in order to introduce proof showing that a felony was attempted in committing it; it was sufficient to charge murder in the common form, and then, upon proof that it was committed in the perpetration of a felony, malice, deliberation, and premeditation were

implied. And statutes defining different degrees of murder, and subjecting them to different punishments, do not render it necessary to alter the form of an indictment for the crime or to supply such facts as would show the offense to be murder in any particular degree. And an indictment in the common-law form is sufficient under statutes dividing the crime of murder into degrees, and providing that all murder perpetrated in the commission of, or attempt to commit, a felony, or certain named felonies, is murder in the first degree, as a charge of murder thereunder. Nor is it necessary to state in an indictment for murder the grade of the offense, where it was committed in the perpetration of, or attempt to perpetrate, an offense enumerated in the statute; nor to allege an intent to kill. The perpetration of, or attempt to perpetrate, any of the named felonies, during which attempt a homicide is committed, in such case stands for, and is the legal equivalent of, the premeditation, deliberation, etc., which otherwise are necessary attributes of murder in the first degree. The felony in such case is but a link in the chain of evidence to show malice, deliberation, and premeditation, and where the indictment charges a killing upon express malice only, proof is admissible to show that the killing was committed in the perpetration of a felony, or of one of the enumerated felonies, or that the motive of the accused in perpetrating the murder was to commit such crime."

Numerous cases are collected in 63 L. R. A., 393, wherein it is said:

"A felony and a homicide committed in perpetrating, or attempting to perpetrate, it, together, constitute the one crime of murder, and may be charged as such in the same manner as ordinary murders are charged.

"Thus, at common law it was not necessary to charge, in an indictment for murder, that the murder was committed in the perpetration of another crime, in order to introduce proof showing that a felony was attempted in committing it; it was sufficient to charge murder in the common form, and then upon proof that it was committed in the perpetration of a felony, malice, deliberation, and premeditation were implied. *State* v. *King,* 24 Utah, 482, 68 P., 418, 91 Am. St. Rep., 808; *State* v. *Meyers,* 99 Mo., 107, 12 S. W., 516."

Upon the facts of this case we hold that an indictment in the common form for murder in the first degree is sufficient.

Exception was taken to the testimony of Noah Sullivan that defendant loaded his gun and shot the second time, it being insisted that this was a separate and distinct offense. We think the testimony was competent as a part of the *res gestae,* as tending directly to prove the crime for which he was being tried, and to show absence of accident or mistake. Two empty shells were found where the defendant stood, and the fact that defendant loaded his gun and shot the second time shows that his shooting was purposeful and intentional.

This was a horrible crime for which the accused offers no excuse or justification.

We find no error in the transcript, and therefore affirm the judgment of the trial court.