IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 9, 2002 Session

## STATE OF TENNESSEE v. JOSEPH JACKSON, JR.

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-09313, 00-09314    Arthur T. Bennett, Judge**

---

**No. W2001-02779-CCA-R3-CD  - Filed December 17, 2002**

---

Defendant attempted to shoot and kill Johnny Maxwell, missed, and accidentally shot twelve-year-old Brittney Taylor, seriously injuring her.  A jury convicted the defendant of attempted first degree murder of Maxwell and attempted first degree murder of Taylor.  He appeals, claiming the trial court erroneously charged the jury, relative to the doctrine of transferred intent; that double jeopardy bars convictions of both offense; and the evidence was insufficient to sustain the attempted first degree murder convictions.  We agree and affirm both convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Gerald D. Waggoner, Memphis Tennessee (at trial), and Larry M. Sargent, Memphis, Tennessee (on appeal), for the appellant, Joseph Jackson, Jr.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; and David N. Pritchard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Joseph Jackson, Jr., was convicted, as charged, of two counts of attempted first degree (premeditated) murder, following a jury trial.  The defendant was sentenced to twenty years on each count, to be served concurrently.  This timely appeal followed.  The defendant contends: (1) insufficient evidence exists to support his conviction; (2) the trial court erred in its charge to the jury, relative to the doctrine of transferred intent; and (3) double jeopardy bars convictions for both offenses.  We disagree and affirm both convictions.

**Facts**

At trial, the State called the following witnesses: Brittney Taylor, Sergeant Dennis McNeil, Officer Lavern Jones, Lydell Yarbrough, and Johnny Maxwell. The defense offered no proof. We have carefully reviewed the testimony of all witnesses. We recite the following facts in light most favorable to the State as the defendant contends the evidence is insufficient to support his convictions.

On February 3, 2000, there was a large altercation between a number of gang members and other students in the parking lot of the MAPCO Express convenience store (MAPCO) on Raines Road in southeast Memphis. The altercation took place in the afternoon, about the time nearby schools were dismissing. The defendant had a "run in" the previous day with some rival gang members and, according to his statements to police, had been threatened by them. Due to that "run in," it was fairly common knowledge in the community that there would be a fight at the MAPCO on February 3, thus there was quite a large crowd in the parking lot.

There is evidence that earlier on February 3, the defendant told his friend, Lydell Yarbrough, there would be an altercation later that day. Yarbrough brought a rifle to school and let the defendant know he had it. It is unclear if Yarbrough brought the rifle because of the potential altercation. The defendant then put it into his backpack and carried it throughout the school day. In order for the rifle to be carried in the backpack without detection, it had to be disassembled.

After school, as the crowd started assembling at the MAPCO, a number of fights broke out, including one between the defendant and Johnny Maxwell. According to at least two witnesses, a police officer and Johnny Maxwell, Maxwell "beat up" the defendant in a fight that lasted about a minute. At this time, the defendant was not carrying the rifle. The crowd at the MAPCO had grown quite large by this time.

Immediately after the fight between the defendant and Maxwell, the defendant walked to a nearby truck where two of his friends, including Yarbrough, were sitting. The police officer stated that Maxwell and his friends were taunting the defendant. The crowd had still not diminished. The defendant then grabbed or was handed the rifle, and walked back with the assembled rifle toward Maxwell. There are differing versions as to who assembled the rifle and whether Maxwell and his friends walked towards the defendant as the defendant walked to the truck or were simply still hanging around the MAPCO lot. Calmly, the defendant walked towards Maxwell, lifted the rifle, and fired one shot in an attempt to kill Maxwell.[1] He missed Maxwell, but the bullet struck twelve-year-old Brittney Taylor, who was walking behind the crowd, in the side. She had to be airlifted to the hospital. The defendant then put the gun into the truck and was almost immediately apprehended

---

[1] The police officer testified that the defendant was close to Maxwell when he fired the gun, describing the distance as "shorter than you and I now," in response to attorney questioning. Maxwell testified the defendant was within 10-15 feet of him when he fired the gun.

by the off-duty police officer who had witnessed the scene. The defendant's two friends drove away from the scene in the truck but were pulled over a short distance from the MAPCO.

The defendant contends, *inter alia*, that the evidence was insufficient to sustain an attempted first degree murder conviction. In light of this, it is important to understand additional versions of the events.

The police officer testified that on February 3, 2000, he was off duty near the fight scene, although he was still in uniform. He said he noticed a large crowd at the MAPCO, with several different fights occurring. He went to the scene and broke up one of the fights. He said he saw the defendant arguing with two shirtless boys who were jumping up and down and "throwing" gang signs at him. The officer testified it appeared as though the defendant had been "gotten the better of." He then witnessed the defendant walk to a green truck and then walk back to the boys who had been taunting him, getting "pretty close" to them. The defendant then fired one shot at Maxwell and "casually" walked back to the truck and put the rifle in it. The officer stated the other two boys at the truck were laughing. After the defendant put the gun back in the truck, the officer testified that he immediately apprehended the defendant. He said the defendant looked "whipped," acted depressed, and said he did not mean to shoot the victim.

On cross-examination, the officer stated that the whole incident took "a very short time," less than thirty seconds.

Lydell Yarbrough, who had pending charges for attempted first degree murder for actions related to this case, testified to the following: He said the defendant told him on the day in question that, on the previous day, the defendant had an altercation with some other boys and was letting Yarbrough know that something might happen that day. Yarbrough testified he (Yarbrough) brought a rifle to school that day, a disassembled one that he was able to keep in his backpack. He told the defendant about the rifle, and the defendant then obtained it and kept it in the defendant's backpack. After school, they went to the MAPCO where a crowd was forming in anticipation of the fights they knew were coming. Yarbrough testified that a fight broke out between the defendant and Maxwell. At that time, the defendant did not have the gun; it was in a truck that Yarbrough and another friend were sitting in at the MAPCO parking lot. After the fight between the defendant and Maxwell ended, a fight Yarbrough said lasted about a minute, the defendant walked over to the truck and got the gun. He stated he believed the defendant had to reassemble the gun. The defendant then walked back to Maxwell and Maxwell's friends, and Yarbrough said he then heard a gunshot. Yarbrough commented that, after the fist fight, the defendant's demeanor was calm. He also testified that the State had not given him any deals to testify and that he was only trying to tell the truth.

On cross-examination, Yarbrough testified that the defendant had told him the altercation, taking place the day before the shooting, had been a fight that the defendant had broken up. He said the defendant told him that, after breaking up the fight, his life was threatened. He stated while there were several fist fights occurring at the MAPCO simultaneously, the one between the defendant and Maxwell was between just the two of them. Yarbrough stated that he had not put the gun together

nor did he encourage the defendant to shoot at Maxwell. When confronted with a statement he had made on the day of the shooting when he said he had given the gun to the defendant, Yarbrough declared that the former statement was incorrect and that the truth was that the defendant came to the truck and got the gun, that Yarbrough only brought it to the fight.

The final witness important for our analysis was Johnny Maxwell. Maxwell testified that he indeed had been in a fist fight with the defendant, one-on-one, that lasted a "few minutes." He stated there were other fights going on at the same time, but his fight with the defendant was just between the two of them. Maxwell admitted that he had beaten the defendant in the fight. He stated that about a minute after the fist fight, he turned to walk away, but saw the defendant walk to the truck, where he was handed the gun by his "partner." He stated he had not walked towards the defendant as the defendant went to the truck. According to Maxwell, the defendant walked to within "ten to fifteen" feet of him and fired the shot that ultimately hit and injured Brittney Taylor.

The defendant was convicted by a jury of attempted first degree murder of both Johnny Maxwell and Brittney Taylor. He was sentenced to twenty years for each conviction, to be served concurrently in the Tennessee Department of Correction, as a Range I standard offender.

**Sufficiency of the Evidence**

The defendant argues that the evidence presented was insufficient to convict him of attempted first degree murder. Specifically, the defendant claims the evidence could not have supported a conviction for more than manslaughter, as he was acting in the heat of passion when he fired the gun. Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). A jury verdict accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. Id.; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, a guilty verdict removes the presumption of innocence which the appellant enjoyed at trial and raises a presumption of guilt on appeal. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant has the burden of overcoming this presumption of guilt. Id.

There must be sufficient evidence to have supported first degree premeditated murder had the defendant been successful in his attempt to kill Maxwell. The applicable definition of first degree murder is, "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202 (a) (1) (supp. 2002). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the

exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." Id.

Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our Supreme Court has delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of the intent to kill the victim by the defendant, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. See Bland, 958 S.W.2d at 660.

There is ample evidence in the record that the jury may have relied upon in determining that the defendant intended and premeditated his actions of retrieving a weapon and firing it in such a manner and at such a distance that the likely result would be death. A rational trier of fact could have determined that the defendant had time to think and premeditate over his actions before he left the initial fight with Maxwell and picked up the gun. No evidence was produced to indicate Maxwell, the intended victim, was armed; therefore it could have been determined the defendant used a deadly weapon against an unarmed victim. There was evidence presented that the defendant told his friends that "something might happen" later that day, which could have been viewed as a declaration of intent. There was evidence the defendant was aware of the availability of the gun and that he disposed of the gun after the shooting, which could indicate preparation for the crime and an effort to conceal the crime. There was evidence that the defendant acted calm and cool after the fight, and a rational jury could have concluded that cool and calm demeanor indicated the defendant was not acting under the heat of passion. The only evidence the defendant offers to prove that no rational jury could have concluded he was attempting first degree murder is the conclusory statement that, because the defendant lost his one-on-one fist fight, he was acting under the heat of passion. Giving the strongest legitimate view of the evidence to the State and drawing all reasonable inferences from the evidence that was presented, we hold there was sufficient evidence to support a rational jury's findings that the defendant premeditated and planned to fire the gun to kill Maxwell.

**Jury Instruction**

The defendant claims the doctrine of "transferred intent" should not have been applied to allow the defendant's intent to shoot Maxwell to be transferred to Taylor. To support his position, the defendant presents an 1849 case, Bratton v. State, 29 Tenn. 103 (1849), in which the Tennessee Supreme Court specifically rejected the common law doctrine of transferred intent in criminal cases. Additionally, the defendant points us to Sullivan v. State, 173 Tenn. 475, 121 S.W.2d 535, 537 (Tenn. 1938), in which our supreme court acknowledged that Tennessee was of the minority view and had never adopted transferred intent beyond use in felony murder. The defendant posits that Tennessee only adopted "transferred intent" to the extent mandated by the 1932 legislative enactment of the state's first felony murder statute. The defendant's argument is misplaced, as Tennessee no

longer applies "transferred intent" but simply evaluates whether there was an intent to cause the ultimate result.

As such, the defendant claims the following charge concerning intent should not have been submitted to the jury:

2. That the defendant acted intentionally. A person acts intentionally with respect to the nature of the conduct, or to a result of the conduct, when it is the person's conscious objective or desire to engage in the conduct or cause the result. A defendant's conscious objective need not be to kill a specific victim. If you find beyond a reasonable doubt that the defendant intended to cause the result, the death of a person, and that he did so with premeditation, then the killing of another, even if not the intended victim, would be first degree murder.

Contrary to the defendant's position, this charge became acceptable as a correct statement of the law following the leading case in Tennessee concerning the doctrine of transferred intent.

In <u>Millen v. State</u>, 988 S.W.2d 164, 164-66 (Tenn. 1999), the defendant intentionally fired a gun at a specific person, but inadvertently killed a random victim. Our supreme court determined that the Tennessee murder statute, Tennessee Code Annotated section 39-13-202, did not limit its application to the intended victim, but incorporated the doctrine of "transferred intent" to allow application to any victim if the intent existed to murder a specific person. The court stated that the common law history of "transferred intent" has little application under our modern statutory law. <u>Id.</u> at 167. The court concluded that if a defendant has the intent to kill an intended victim and an innocent bystander is killed, the element of intent will be satisfied. <u>Id.</u> at 168.

After <u>Millen</u>, the Tennessee Pattern Jury Instructions were amended to conform with the language contained therein, which resulted in the exact language used in the instant case. We conclude it was not error to provide the jury with the instruction.

The evidence indicates that the defendant intended to shoot and kill Maxwell, but he inadvertently shot and injured Taylor. The intent to shoot and kill Maxwell was the conduct intended by the defendant. "Transferred intent" being incorporated into the definition of intent, we conclude the trial court did not err.

**Double Jeopardy**

The defendant claims the trial court punished him twice for the same offense by convicting him of both the attempted murder of Maxwell and the attempted murder of Taylor, despite there being only one act. "The constitutional right against double jeopardy protects against : (1) a second prosecution after an acquittal; (2) a second prosecution after a conviction; and (3) multiple punishments for the same offense." <u>State v. Beauregard</u>, 32 S.W.3d 681, 682 (Tenn. 2000). The rule in Tennessee is well-settled that constitutional provisions against double jeopardy protect an accused

from the peril of a second punishment and a second trial for the same offense. Whitwell v. State, 520 S.W.2d 338, 341 (Tenn. 1975); State v. Taylor, 912 S.W.2d 183, 185 (Tenn. Crim. App. 1995).

In support of his position, the defendant cites State v. Nickens, No. 03C01-9205-CR-00189, 1993 Tenn. Crim. App. LEXIS 513 ( Knoxville, Aug. 6, 1993). In Nickens, this Court held that a defendant could not be subjected to punishments for both driving on a revoked license and for felonious operation of a motor vehicle if they arose from the same incident. Id. at *25. Although not directly relevant to the instant case, it should be noted that the Nickens court actually allowed separate prosecutions for multiple crimes arising from the same transaction. The defendant in Nickens, over the State's objection, pled guilty to reckless driving and driving on a revoked license, yet was still prosecuted for the felonious operation of a motor vehicle. Reckless driving and driving on a revoked license are lesser offenses of felonious operation; yet, despite the acceptance of the guilty plea, this Court allowed the felony prosecution, concluding that the principles of double jeopardy protection, finality, and prevention of prosecutorial overreaching were not implicated since the guilty plea was objected to by the State. Id. at *19. Nonetheless, it is difficult to see how Nickens applies in the instant case, in light of the well-established position that a single criminal episode, involving multiple victims, can sustain multiple convictions. Nickens dealt with multiple punishments stemming from the same act but did not focus on whether that act resulted in multiple victims. It is the presence of *victims* that distinguishes the present case from Nickens.

In Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed. 306 (1932), the United States Supreme Court stated that any resolution of a question about whether multiple punishments are allowed must include statutory construction analysis relative to whether the legislature intended to punish for only one or for two crimes. Similar to the question of whether multiple offenses apply to a singular act, the question of how many units of prosecution can be used when a continuing course of conduct occurs is answered by determining how many units the legislature intended. State v. Davis, 654 S.W.2d 688, 696 (Tenn. Crim. App. 1983). Clearly, legislative intent is important, so we must determine if the legislature intended for there to be the possibility of multiple convictions when there are multiple victims stemming from a single act. First degree murder in Tennessee is defined as: (1) A premeditated and intentional killing of another; (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, . . . Tenn. Code Ann. § 39-13-202(a). Our courts have interpreted this as meaning there can be multiple convictions when there are multiple victims.

In State v. Goins, 705 S.W.2d 648, 651 (Tenn. 1986), *citing* State v. Irvin, our supreme court stated, "generally if a criminal episode involves several victims who have personally been victimized, the evidence could sustain multiple convictions." See State v. Irvin, 603 S.W.2d 121 (Tenn. 1980) (distinguishing crimes against the person from crimes against property, *quoting from* Vigil v. State, 563 P.2d 1344, 1352 (Wyo. 1977)), see also State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996). Additionally, the court in Irvin stated, "It seems illogical to us, as a general proposition, to hold that when two persons have been killed by an accused, he has committed only one homicide. Prior cases in this state so holding are overruled or modified to the extent that they conflict herewith." Irvin, 603 S.W.2d at 123; see also State v. Pelayo, 881 S.W.2d 7, 9-10 (Tenn. Crim. App. 1994) (holding that if a criminal actor displays a deadly weapon or causes serious bodily injury to more than one person, such conduct would justify convictions for each victim involved).

Because the two separate convictions in the instant case arose from two separate and distinct *victims*, we hold the trial court did not err in allowing the two convictions.

Accordingly, the judgment of the trial court is affirmed.

                                             _____

                                             JOHN EVERETT WILLIAMS, JUDGE