# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

## STATE OF TENNESSEE v. JASON THOMAS BEELER

### Direct Appeal from the Circuit Court for Obion County
### No. 7-588   William B. Acree, Jr., Judge

---

### No. W1999-01417-CCA-R3-CD - Decided November 22, 2000

---

The defendant appeals from jury trial convictions for reckless homicide, felony murder, aggravated burglary, and two counts of especially aggravated kidnapping. In this appeal, the defendant alleges insufficient evidence, errors in admitting certain evidence, prosecutorial misconduct, improper instructions, and error in denying his writ of *error coram nobis.* Concluding that it was reversible error to not instruct on the lesser-included offenses of felony murder, we remand for a new trial on the felony murder count. We affirm the remaining convictions.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part, Reversed in Part, and Remanded for a New Trial for Indictment for Felony Murder

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Charles S. Kelly, Sr., Dyersburg, Tennessee, and L. Lee Harrell, Trenton, Tennessee, for the appellant, Jason Thomas Beeler.

Paul G. Summers, Attorney General & Reporter, Mark E. Davidson, Assistant Attorney General, Thomas A. Thomas, District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Jason Thomas Beeler, appeals from his Obion County Circuit Court convictions of reckless homicide, a Class D felony; first degree felony murder, a Class A felony; aggravated burglary, a Class C felony; and two counts of especially aggravated kidnapping, Class A felonies. See Tenn. Code Ann. § 39-13-215 (1997) (reckless homicide); § 39-13-202 (1997) (felony murder); § 39-14-403 (1997) (aggravated burglary); § 39-13-305 (1997) (especially aggravated kidnapping). After being convicted by a jury, the defendant was sentenced as a Range I standard offender to two years for the reckless homicide, life for the first degree murder, three years for the aggravated burglary, and 20 years for each especially aggravated kidnapping. The reckless homicide conviction was merged into the first degree murder conviction. The sentences were to be served concurrently in the Department of Correction. In this appeal, the defendant makes the following allegations:

1. The evidence was not sufficient,[1]

2. The trial court erred in denying a motion of acquittal after hearing testimony that the defendant was not capable of forming the requisite intent,

3. The trial court erred by permitting testimony that the defendant chose not to make a statement when he was booked,

4. The trial court erred by admitting evidence of prior bad acts,

5. The trial court erred by admitting evidence of the defendant's prior felony conviction,

6. The testimony of one witness was offered solely to arouse passion and sympathy in the jury,

7. The trial court erred by not admitting a statement he made to his father,

8. The trial court erred by not admitting a statement made by his wife to the police,

9. The trial court erred by admitting testimony of Dr. Deering, the medical examiner,

10. The trial court erred by admitting testimony from the state's psychologist regarding statements the defendant made during the evaluation,

11. The state committed prosecutorial misconduct in its closing argument,

12. The trial court erred by not instructing the jury on lesser-included offenses for felony murder,

13. The trial erred by not giving a special instruction on diminished capacity,

14. The trial court erred by failing to give a proper instruction regarding mental disease or defect,

15. The trial court erred by giving the jury written instructions that had portions crossed out, and

---

[1] We have combined several of the defendant's issues into a single sufficiency issue which covers all of his convictions.

16. The trial court erred by denying the petition for writ of *error coram nobis.*[2]

Following a review of the record and the briefs of the parties, we reverse the felony murder conviction because the trial court failed to instruct the jury on the lesser-included offenses, and we affirm the remaining convictions.

In the light most favorable to the state, the evidence at trial demonstrated that the defendant and his then-wife, Jeanne Beth, were having marital difficulties. The turning point in their relationship occurred after the birthday party for their five-year-old daughter in late February 1998. Before the end of that month, the defendant and his wife separated with Jeanne Beth caring for their daughter.

On Friday, March 7, Jeanne Beth and her daughter were staying at Jeanne Beth's father's house. She expected her father, a truck driver, to return late that night. Also sharing the house that night were Jamie Boane, the homicide victim, and Chucky Minnick. These two men worked for Jeanne Beth's father and roomed in his house.

Throughout that Friday evening, the defendant called Jeanne Beth on the telephone. The defendant asked to speak with his daughter on the first call. He also spoke with his wife, during that call and later ones, about their getting back together. He told her that life was not worth living without her. After one of those calls, Jeanne Beth called the defendant's mother and told her that the defendant had threatened suicide. During the defendant's last telephone call to Jeanne Beth, he told her that if she did not hear from him in ten minutes, it would be because he had killed himself.

After making the last call, the defendant drove to Jeanne Beth's father's house. He parked off to one side of the house. Carrying a pump action shotgun, he walked to the front of the house, stood on a plastic bucket and peered into a bedroom window. He saw someone sleeping in the bed. He continued walking around the house until he came to the back door.

Inside the house, Jeanne Beth and Jamie Boane were in the kitchen. Jeanne Beth saw a shadow through the backdoor window, and Boane went to the door. As Boane reached for the door knob, the defendant shot through the lock to open the door, striking Boane in the left hand. With his other hand, Boane pushed Jeanne Beth, who had come up behind him, back and away from the door. A second shotgun blast through the backdoor window struck Boane in the left side of his neck. He fell to the floor and cried out, "I'm dying."

Jeanne Beth ran from the kitchen into the room where Chucky Minnick was sleeping and then into her father's bedroom where her daughter was sleeping. Minnick woke up when he heard the shots, and after Jeanne Beth ran through the room yelling that Boane had been shot, he hid in the closet. When Jeanne Beth entered the bedroom she locked the door behind her. Moments

---

    2        Our discussion of the issues in this opinion is in a different order than their presentation in the parties' briefs.

-3-

later, the defendant kicked down the bedroom door and Jeanne Beth jumped on her daughter to cover and protect her. Still carrying the shotgun, the defendant told Jeanne Beth to come with him and bring his daughter. He escorted them to his parked car, and he drove them away.

After hearing the defendant leave, Minnick left the closet and saw Jamie Boane, who had crawled from the kitchen to the living room. Minnick tried to use the telephone to call for help, but the line was dead. He then drove to the victim's mother's house, where they called the sheriff and an ambulance.

During this time, the defendant's family was searching for him. Remembering that the defendant had his wife's cellular telephone, the defendant's father called the defendant, who was driving around with Jeanne Beth and his daughter. He told his father, "Somebody told me that I shot somebody." The defendant agreed to meet his father in a field near his grandparents' home. When the defendant's parents got to the field, they found the defendant and his wife outside the car. The defendant's daughter was in the backseat of the car, and the shotgun was still in the car. The defendant's father took the child to his house, and the defendant's mother stayed with the defendant and his wife. The three walked to the defendant's grandparents' home, where the defendant finally gave himself up to the police.

The defendant was indicted and charged with one count of first-degree premeditated murder, one count of murder in the perpetration of burglary, one count of aggravated burglary, and two counts of especially aggravated kidnapping. At the conclusion of the proof at trial, the trial court granted a judgment of acquittal only on the charge of first-degree premeditated murder; on that count of the indictment the trial court submitted to the jury the charge of second-degree murder and the lesser-included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide. The jury returned a verdict finding the defendant guilty of reckless homicide, felony murder, aggravated burglary, and the two counts of especially aggravated kidnapping.

*I. Sufficiency of the Evidence*

The defendant challenges the sufficiency of the convicting evidence. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Boling, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1987). However, before an accused may be convicted

of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

The defendant was convicted of felony murder, which depended upon the underlying felony of aggravated burglary. He was convicted of aggravated burglary, which relied upon the underlying felony of especially aggravated kidnapping. Accordingly, the defendant's felony murder conviction is ultimately predicated upon the defendant committing especially aggravated kidnapping.

*a. Especially Aggravated Kidnapping*

The defendant complains that the evidence was insufficient to support his convictions for especially aggravated kidnapping of his wife and child. Especially aggravated kidnapping is defined in pertinent part as false imprisonment accomplished with a deadly weapon. Tenn. Code Ann. § 39-13-302(a)(1) (1997). False imprisonment can be committed by a person "who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (1997).

Visualizing the evidence most favorably to the state, we conclude that the evidence sufficiently supports the defendant's convictions of especially aggravated kidnapping of his then-wife and child. The defendant, after shooting his way into the house and fatally wounding Jamie Boane, kicked down the door where his wife and child were hiding. His wife's first reaction when the defendant broke down the door was to protect and shield her five-year-old daughter by covering her with her body. The defendant, with shotgun in hand, told his wife that he was going to kill her. Apparently changing his mind, he told her to get his daughter and come with him. The defendant's wife testified that she felt threatened because the defendant had the shotgun, and it was pointed at her. The defendant escorted them out of the house, into his car, and drove away. These facts lead us to the inescapable conclusion that a jury which accredited the state's proof could find beyond a

reasonable doubt that the defendant committed especially aggravated kidnapping of his wife and daughter.

The defendant argues that it was legally impossible to kidnap his wife and child because he was not yet divorced, there was no protective order against him, and as father, he still had custody of the child. We disagree. The familial status of the victim is irrelevant to the offense of kidnapping. It is clear that a non-custodial parent can be guilty of kidnapping his child. See State v. Holtcamp, 614 S.W.2d 389, 392 (Tenn. Crim. App. 1980). In addition, and although fortunately not occurring frequently, there are reported cases of kidnappings involving family members where the kidnapper is married or has custody of the child. See, e.g., King v. State, 992 S.W.2d 946, 949-50, 956 (Tenn. 1999) (previous conviction where defendant kidnapped his wife used as aggravating circumstance); State v. Herndon, 704 S.W.2d 728, 729 (Tenn. Cr. App. 1985) (father, who was awarded custody of child in Tennessee, convicted of kidnapping his child from mother in Nevada).

In King, for instance, our supreme court affirmed the use of a prior kidnapping conviction as an aggravating circumstance supporting the defendant's sentence of death. King, 992 S.W.2d at 949-50. The court stated that the "mere fact that the victim of a kidnapping is either a spouse or a former spouse does not decrease the magnitude or substance and persuasiveness of that crime." Id. at 950.

Consequently, we conclude that in this case the familial relationship is not relevant considering the defendant's violence in gaining entrance to where his wife had sought security for herself and her daughter and considering his use of a deadly weapon to ensure compliance with his wishes.

The defendant also argues that he did not have the intent to remove or confine the victims and that the proof showed this by his statement to his wife to get his daughter and "let's go." He claims that this shows that he was concerned for their safety and wanted to get them away from the scene of the shooting. Questions concerning the weight and value of the evidence are resolved by the jury and not by this court. See Cabbage, 571 S.W.2d at 835. Because evidence contradictory to the defendant's position was introduced, this became a classic jury question. The jury's determination warrants our approbation.

*b. Aggravated Burglary*

The defendant complains that the evidence was insufficient to support his conviction for aggravated burglary. Aggravated burglary occurs when an individual enters a habitation "without the effective consent of the property owner" and, in this case, commits or attempts to commit a felony, theft or assault. Tenn. Code Ann. §§ 39-14-402(a)(3), -403 (1997).

In the case at bar, the proof showed that the defendant used a shotgun to shoot the lock from the back door in order to enter the house. His wife testified that she had no intention of letting him in the house. The house was the usual residence of three others, and the defendant's wife

was staying there for the night. The defendant entered the house and committed especially aggravated kidnapping. These facts provide overwhelming evidence from which a jury could find beyond a reasonable doubt that the defendant committed aggravated burglary.

The defendant argues that he did not have the intent to commit a crime in the house, although he admits to breaking into the house. One statutory definition of aggravated burglary requires that the offender enter a habitation without consent but with the intent to commit a felony, theft or assault. Tenn. Code Ann. § 39-14-402(a)(1) (1997). Another definition of aggravated burglary does not require that the defendant enter with intent to commit a crime but requires only that the defendant enter and commit or attempt to commit a felony, theft or assault. Tenn. Code Ann. § 39-14-402(a)(3) (1997). The indictment charged the defendant with committing aggravated burglary under this second definition, and the trial court instructed the jury on aggravated burglary under this second definition. The evidence showed that the defendant committed a felony in the house after entering without consent, and the jury convicted the defendant accordingly. Thus, the evidence supports a conclusion that the defendant committed aggravated burglary.

*c. Felony Murder*

The defendant complains that the evidence was insufficient to support his conviction for felony murder in the perpetration of a burglary. The statute under which the defendant was convicted defined felony murder as a "killing of another committed in the perpetration of . . . any . . . burglary." Tenn. Code Ann. § 39-13-202(a)(2) (1997).

The proof in this case showed that Jamie Boane died as a result of two shotgun wounds, one to the hand and the other to the neck. The defendant admitted to firing the first shotgun blast, which struck the victim in the hand. There was proof that the second shotgun blast was fired by the same pump action shotgun. The defendant also admitted that he fired the first shot in order to open the locked door and enter the house. Once inside the house, the defendant committed especially aggravated kidnapping. These facts supply abundant evidence from which a jury could find beyond a reasonable doubt that the defendant committed felony murder.

The defendant argues that he did not have the requisite intent to support the felony murder conviction. He points to State v. Buggs, 995 S.W.2d 102 (Tenn. 1999), in support of his argument. In Buggs, our supreme court held that "in a felony-murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Id. at 107. Further, the court held that intent to commit the underlying felony may not be presumed from the act of committing that felony. Id. The jury, however, may still "infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id.

The proof showed that the victim was fatally wounded as a result of the defendant shooting at the back door in an attempt to open it. After entering the house and immediately going to where his wife was hiding, the defendant told her that he was going to kill her. She testified that

he apparently changed his mind, and he escorted her and the child to his car. After driving to a field and meeting his parents, the defendant wanted his mother to leave so that he and his wife could die.

The defendant's conviction for felony murder in perpetration of a burglary comports completely with Buggs. Entering the house is one element of burglary. Tenn. Code Ann. § 39-14-402(a) (1997). Another element is committing or attempting to commit a felony, theft or assault. Tenn. Code Ann. § 39-14-402(a)(3) (1997). The defendant admitted that when he shot at the door, he intended to enter the house and kill himself in front of his wife. Although killing oneself in front of another is not a felony, the defendant's actions immediately after the shooting indicate that he intended more than just committing suicide. The evidence showed that as soon as the defendant entered the house, he promptly went to where his wife was hiding, threatened her, and made her leave the house with him. We conclude that a jury could reasonably infer from the defendant's actions immediately after the shooting that the defendant intended to kidnap his wife and child when he fatally shot the victim.

*d. Reckless Homicide*

The defendant admits in his appellate brief that the state's proof would support the reckless homicide conviction. Nonetheless, he argues that evidence was presented that negated his culpability for that offense; however, he admits that the evidence in the light most favorable to the state was sufficient to support the conviction for reckless homicide. To reiterate, questions concerning the weight and value of the evidence are resolved by the jury and not by this court. See Cabbage, 571 S.W.2d at 835. The evidence was sufficient. We discuss the defendant's argument with respect to his mental state in the next section.

*e. Motion for Judgment of Acquittal*

The defendant alleges that the trial court erred in denying a motion for judgment of acquittal after hearing testimony from Dr. Monet that the defendant was not capable of forming the requisite intent. The defendant argues that with this testimony, the evidence was insufficient to convict him on any of the counts.

Rule 29 of the Rules of Criminal Procedure empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. See Tenn. R. Crim. P. 29(a); State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). The standard by which a trial court rules upon a motion for judgment of acquittal is essentially the same standard applied on appeal in determining the sufficiency of the evidence after a conviction. Ball, 973 S.W.2d at 292; see Tenn. R. Crim. P. 29(a). We have previously determined that the evidence, in the light most favorable to the state, was sufficient to support the defendant's convictions. Because a judgment of acquittal requires that the evidence be viewed in the light most favorable to the state, the trial court properly denied the motion for judgment of acquittal.

The defendant places too much weight on the testimony of his expert and ignores the existence of contradictory evidence. Again, questions concerning the weight and value of the evidence are resolved by the jury and not by this court. See Cabbage, 571 S.W.2d at 835. The defendant presented evidence, through Dr. Monet, that he was incapable of forming the requisite mental intent for the charged offenses. The state presented contradictory evidence, both in its case-in-chief and in rebuttal. It was the jury's duty to resolve the issue of whether the defendant was capable of forming the requisite mental state for each of the offenses. The jury obviously accredited the state's witnesses by convicting the defendant.

## II. Admissibility of Evidence

The admission of evidence is generally within the broad discretion of the trial court; absent an abuse of that discretion, the trial court's decision will not be reversed. See State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996); State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992).

### a. Evidence that Defendant Chose not to Make a Statement

The defendant complains that the trial court erred in permitting a police officer to testify that the defendant chose not to make a statement when he was booked. The state concedes that the testimony was improper and should have been excluded. However, the state argues that the error was harmless.

During the direct examination of Jeff Jackson, a Union City police officer, he testified that he spoke with the defendant when he was being booked. Officer Jackson said that he advised the defendant of his Miranda rights by reading from a standard form, which included a waiver of those rights. The following exchange then transpired:

[State]:     And when you read this to Mr. Beeler, in your opinion did he appear to understand it?

[Witness]:   Yes, he did.

[State]:     And did he sign the form?

[Witness]:   Yes, he did.

[State]:     Did he make any statement?

[Witness]:   The only thing he said was that he did not want to make a statement at that time.

Before this testimony was admitted, the defendant objected on the grounds that it was prejudicial and that the defendant had the right to not make a statement. The state argued that the purpose of this testimony was to show that the defendant understood what was going on and that he was coherent shortly after the shooting. The trial court overruled the objection. No curative instruction explaining the Miranda rights or that the defendant had the right to not make a statement was requested or given.

Our path of inquiry is well worn. In Harrison v. State, 532 S.W.2d 566 (Tenn. Crim. App. 1975), this court held that it was improper for the state to elicit from a witness testimony that the defendant refused to make any statement after being advised of his constitutional rights. See also State v. Kelly, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984); Hart v. State, 592 S.W.2d 905, 906 (Tenn. Crim. App. 1979).

> Of course it was improper for the State to elicit from its witness that the defendant refused to make any statement after being advised of his constitutional rights--including the right to remain silent. Mays v. State (Tenn. Cr. App.), 495 S.W.2d 833; State v. Flanagan, 223 Tenn. 134, 443 S.W.2d 25. Manifestly, it is intolerable to penalize an accused for remaining silent or refusing to make a statement to police authorities after being advised of his constitutional right to remain silent in the face of accusation. It is elementary that a person arrested upon a charge of crime, and thus accused thereof, has an absolute and inviolable constitutional right under the Fifth Amendment, applicable to the states by operation of the Fourteenth Amendment (Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653), to remain silent. Indeed, Miranda mandates, among other things, that an accused be so advised before interrogation by law enforcement officials. It would be an intolerable anomaly if an accused's exercise of his constitutional right to remain silent, of which he must be informed before any questioning by law enforcement officials concerning the offense for which he was arrested, could thus be turned against him.

Harrison, 532 S.W.2d at 570-72. The trial court in this case thereby erred in allowing Officer Jackson to testify that the defendant refused to make a statement after being advised of his Miranda rights.

Despite this offending testimony, we are convinced that its admission was harmless beyond a reasonable doubt and that it did not trench upon the defendant's constitutional rights to the degree that would nullify his trial and conviction. We note that the testimony consists of a single statement made during a three-day trial. The officer did not provide any details beyond the one statement, and the state did not argue in closing that the defendant did not make a statement. Moreover, on cross examination of the officer, defense counsel elicited from the officer that he had to show the defendant where to sign the form, presumably to rebut that the defendant was coherent after the shooting. See State v. Donald Ray Smith, No. W1990-00156-SC-R11-CD, slip op. at 10

(Tenn., Jackson, June 30, 2000) ("When the State places objectionable evidence before the jury, and defense counsel inquires at length about the evidence on cross-examination, any error in admitting the evidence is generally cured."). Although the trial court gave the jury no curative or limiting instruction that a person in custody who has been advised of his rights is not obligated to make any statement, we cannot conclude that the omission provides grounds for reversal. See, e.g., State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982).

*b. Evidence of Prior Bad Acts*

The defendant complains that evidence of a prior bad act was erroneously admitted when Jeanne Beth testified that the defendant had broken into her father's house a few days before the shooting. He argues that the witness described an uncharged act that was inadmissible under Rule 404(b) of the Tennessee Rules of Evidence. The defendant did not timely object to this testimony.

It is a well-established rule that a defendant's failure to timely object and call this issue to the trial court's attention constitutes a waiver of appellate review of the issue. See Tenn. R. App. P. 36(a); State v. Hall, 8 S.W.3d 593, 603 (Tenn. 1999); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999). Accordingly, this issue is waived. Regardless, a review of the record shows that the witness volunteered the information, and the prosecutor did not inquire into the details of the defendant breaking into the house. Furthermore, the danger and prejudice that arise from admitting evidence of a prior bad act is that jurors may view a defendant as having a propensity to commit certain offenses – "if he did it once, he'll do it again" logic. In this case, the defendant admitted that he fired the first shot in order to open the locked door and enter the house. As a result, the jury had no reason to speculate whether an earlier break-in somehow demonstrated a propensity for the defendant to commit any of the charged offenses. We conclude that the defendant was not prejudiced by this testimony.

*c. Impeachment of the Defendant as a Witness*

The defendant also complains that he was improperly impeached with evidence of his prior felony theft conviction. The defendant argues that impeachment was improper because his credibility was not at issue and that the evidence was inadmissible because it was highly prejudicial. During the cross-examination of the defendant, the district attorney asked him if he had pleaded guilty to felony theft of a vehicle in 1996. The defendant responded that the conviction was for receiving stolen property, to which the district attorney countered that the record would show that the defendant was convicted of felony theft for the possession of a stolen vehicle.

The State of Tennessee may use a prior conviction to impeach an accused if the conviction meets the criteria established by Rule 609 of the Tennessee Rules of Evidence. The criteria for admission under Rule 609 are: (a) the prior conviction was for a crime punishable by death or imprisonment in excess of one (1) year or a misdemeanor conviction involving dishonesty or a false statement; (b) less than ten (10) years has elapsed between the date the accused was

released from confinement and the commencement of the present prosecution; (c) the state must give reasonable written notice of the particular convictions prior to trial if it intends to use them to impeach the accused; and (d) the trial court, upon request, must find the probative value of each conviction on the issue of credibility outweighs its unfair prejudicial effect. Tenn. R. Evid. 609(a)(2)-(3), (b). See State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992).

In the case at bar, the defendant had been convicted previously of a Class E felony theft which occurred less than ten years before his trial. Seven months before trial, the state filed a written notice that it intended to impeach the defendant with his felony conviction. The first three requirements of Rule 609 have thus been satisfied, and we now look at the fourth, whether the probative value outweighs its unfair prejudicial effect. First, we note that the defendant himself introduced evidence of this conviction during his direct examination. Defense counsel asked the defendant if he knew that the vehicle was stolen, and the defendant replied that he did not. At this point, the trial court properly rebuked defense counsel for delving into whether the defendant was innocent of the crime for which he was convicted. The defendant then admitted that he pleaded guilty to purchasing a stolen vehicle. On cross-examination, the district attorney established that the defendant was convicted of felony theft. Inasmuch as the defendant first introduced this evidence, he cannot now complain that it was improperly admitted. See, e.g., State v. Kendricks, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996) (defendant's "less than candid" testimony on direct examination opened the door to further inquiry on cross-examination about prior convictions).

Second, the defendant argues that his credibility was not at issue. We disagree. The defendant testified at trial, and he desired the jury to believe his version of the circumstances over that of the state's witnesses. As such, his credibility was at issue. This principal is firmly embedded in our jurisprudence. Evidence of a felony theft conviction is highly probative of credibility. See State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (offense of theft is "highly probative of credibility" because the crime involves dishonesty). Accordingly, we conclude that the district attorney's cross-examination with respect to the defendant's felony theft conviction was proper.

*d. Testimony Offered to Arouse Passion and Sympathy*

The defendant complains that the testimony of Regina Caksackkar, the sister of the homicide victim, was offered solely to arouse passion and sympathy of the jurors. Ms. Caksackkar testified that the homicide victim was 31 years old when he died and that he had two children. She said that his mother had a heart attack several weeks before the trial and could not attend. Also, Ms. Caksackkar testified that she was engaged to Kenneth Tanner, Jeanne Beth's father. The defendant did not timely object to any of the testimony by Ms. Caksackkar, although he did raise the issue in his motion for new trial. He now claims that the introduction of this evidence constitutes plain error. It is a well-established rule that a defendant's failure to timely object and call this issue to the trial court's attention constitutes a waiver of appellate review of the issue. See Tenn. R. App. P. 36(a); State v. Hall, 8 S.W.3d 593, 603 (Tenn. 1999); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999). Accordingly, this issue is waived, and we do not find plain error.

Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, Tenn. R. Evid. 402, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. We conclude that the testimony, although not overly probative, was not unfairly prejudicial. The witness, who was the first witness to testify in the three day trial, testified about the homicide victim's family. She also testified about her and the victim's relationships to the defendant's family. She was engaged to Jeanne Beth's father, and the victim worked for Jeanne Beth's father. This testimony provided the jury with background information on the various parties involved and future witnesses. There was no plain error. See Tenn. R. Crim. P. 52(b).

*e. Failure to Admit Defendant's Statement*

The defendant complains that a statement he made to his father was not admitted by the trial court. The defendant's father testified that on the night of the shooting, he called the defendant's cellular telephone and when his son answered, his son blurted out, "Somebody told me I shot somebody." The defendant's father asked, "What did you say?," to which the defendant answered, "Somebody told –." At this point, the state objected on hearsay grounds. The defendant argued that the statement was not hearsay; rather, it was offered to show the circumstances leading up to the defendant's meeting with his father in the field. The trial court sustained the objection. The trial court instructed the witness that he was not to testify as to what he was told. The trial court did not give a curative or limiting instruction to the jury. The defendant did not make a proffer of evidence of any additional statements made by the defendant to his father.

On appeal, the defendant argues that his statement, "Somebody told me I shot somebody," falls under the excited utterance hearsay exception, see Tenn. R. Evid. 803(2), and under the then existing state of mind, emotion and mental feeling hearsay exception. See Tenn. R. Evid. 803(3). The defendant claims that the statement is necessary to show the defendant's state of mind and behavior shortly after the shooting. The state responds that the jury heard, as substantive evidence, the gist of the defendant's statement, and only the repetition of the statement was cut off.

The jury heard the evidence that the defendant complains was not admitted. Furthermore, the jury was not instructed to ignore or to not consider the testimony reciting the defendant's statement. Accordingly, although the trial court sustained the objection, the "bell had been rung" and the jury heard the evidence as substantive evidence. We find no reversible error.

*f. Failure to Admit Wife's Statement*

The defendant complains that his then-wife's statement to the police was not shown to the jury. Jeanne Beth testified on direct examination that she saw the defendant's face through

-13-

the backdoor window before the shooting. During the defendant's cross-examination of her, she testified that she wrote a statement for the police the night of the shooting. She admitted that she did not put in her statement that she saw the defendant before the shooting. Her statement read, "Then I sat up on the bar then, through the window, I saw something. I went to get down, and Jamie saw Jason." She explained that the differences between her statement and testimony were because she was upset when she made the statement. She was adamant that she saw the defendant that night, and she was sure that the homicide victim also saw him because the victim was standing beside her when she saw the defendant. The defendant cross-examined Deputy Gargus of the Obion County Sheriff's Department about Jeanne Beth's statement. He testified that she made the statement. The defendant then sought to admit a copy of the statement and show it to the jury. The trial court permitted the statement to be marked for identification purposes only.

The defendant argues that the statement was admissible as a prior inconsistent statement. This court has said in the past that the Tennessee Rules of Evidence do not define "inconsistent." See State v. Kendricks, 947 S.W.2d 875, 882 (Tenn. Crim. App. 1996); see also Tenn. R. Evid. 613. Considering that the witness's statement was not clearly inconsistent with her testimony, we do not feel compelled to address that issue in the case at bar. Rather, we are persuaded by the general rule that "[e]xtrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement." State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998) (holding that "the admissibility of the extrinsic evidence is contingent upon whether the witness admits or denies having made the prior inconsistent statement"). "The unequivocal admission of a prior statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness during trial." Id. In the case at bar, the witness testified that she wrote the statement, and she explained that she was upset that night. In light of Jeanne Beth's unequivocal admission to making the statement, we conclude that the copy of the statement was inadmissible, and the trial court correctly permitted the statement to be marked only for identification.

The defendant also argues that the trial court did not comply with Tennessee Rule of Criminal Procedure 30.01 because it did not have good cause for determining that the copy of the statement should not go to the jury room. The defendant's reliance on rule 30.01 is misplaced. That rule requires that all exhibits be given to the jurors and taken into the jury room, unless the trial court determines otherwise, for good cause. Tenn. R. Crim. P. 30.01. Because the statement was not admissible, it was marked only for identification purposes and was not made an exhibit; therefore, the rule does not apply.

*g. Medical Examiner's Testimony*

The defendant complains that the testimony of Dr. Deering, the medical examiner, was improper. First, he complains that the doctor testified about the contents of hospital records that he reviewed and that those records were not present in court. Next, the defendant complains that the doctor testified as to the cause of death of the homicide victim only on redirect examination, but not

on direct. Finally, the defendant complains that the prosecutor engaged in improper redirect examination.

Dr. Deering's testimony was straightforward and unremarkable. Quite simply, there was nothing improper about allowing Dr. Deering to express his expert opinions and conclusions. Pursuant to Rule 703 of the Tennessee Rules of Evidence, "[e]xperts in the field may base opinions on facts not in evidence under this rule." Advisory Commission Comments, Tenn. R. Evid. 703. That Dr. Deering had reviewed and then testified about hospital records, which had not been independently offered and admitted at trial, is of no moment. Moreover, Rule 705 of the Tennessee Rules of Evidence provides a mechanism for the disclosure of facts or data underlying expert opinions. The defendant could have, but did not, ask the trial court to require Dr. Deering or the prosecution to obtain and produce for defense inspection the hospital records of which he complains.

More fundamentally, however, the defendant has failed to cite any authority in his appellate brief to show why Dr. Deering's testimony was objectionable and why it should have been excluded. Likewise, he has failed to explain how any part of Dr. Deering's testimony was improperly and unduly prejudicial. Furthermore, the defendant failed to make any objection at trial to the admission or alleged prejudicial character of Dr. Deering's testimony. The issue is waived. Tenn. R. Crim. App. 10(b).

### III. Prosecutorial Misconduct

#### a. Defendant's Statements Made to State's Psychologist

The defendant complains that it was prosecutorial misconduct for the prosecution to question an examining psychologist regarding statements the defendant made during a forensic evaluation. The psychologist, Dr. Lynne Zager, testified during the state's rebuttal. When asked by the state what the defendant told her about the shooting, she testified to the statements the defendant made to her about the shooting. The defendant did not contemporaneously object to this testimony, although he did raise the issue in his motion for new trial. The defendant's failure to contemporaneously object and call this issue to the trial court's attention constitutes waiver of the issue. See Tenn. R. App. P. 36(a); State v. Hall, 8 S.W.3d 593, 603 (Tenn. 1999); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999). Regardless, we will consider the issue on its merits.

Although the defendant couches this complaint as one of prosecutorial misconduct, the issue is truly one of admissibility because, in essence, the defendant is complaining that the state introduced evidence that was not admissible. Of course, there would be no prosecutorial misconduct if the testimony was admissible. State v. Alley, 776 S.W.2d 506, 519 (Tenn. 1989) (holding that prosecutor's leading questions regarding false and non-existing facts constituted misconduct).

The defendant points to State v. Huskey, 964 S.W.2d 892 (Tenn. 1998), as support for his argument that the testimony of the psychologist was improper. In Huskey, the defendant filed an interlocutory appeal to prevent disclosure of a mental evaluation to the state. Id. at 892-96. The

-15-

<u>Huskey</u> court reaffirmed its holding in <u>State v. Martin</u>, 950 S.W.2d 20 (Tenn.1997). In <u>Martin</u>, our supreme court held

> that where a defendant asserts a defense based on his or her mental state, a court-ordered mental evaluation does not violate the right against self-incrimination provided any statements made during the evaluation, and any "fruits" derived from such statements, are used by the prosecution only for impeachment or rebuttal of the defense.

<u>Martin</u>, 950 S.W.2d at 21. The <u>Huskey</u> court stated that "the admissibility of the defendant's statements made during an examination at trial is expressly limited to impeachment or rebuttal of the mental condition evidence introduced by the defendant." <u>Huskey</u>, 864 S.W.2d at 897. "In other words, such material may not be used by the prosecution to prove the guilt of the defendant and may not be used if the defense does not introduce testimony at trial on mental condition." <u>Martin</u>, 950 S.W.2d at 24-25.

In the case at bar, the defendant introduced evidence of his claimed diminished capacity. The defendant's expert testified that the defendant did not have the capacity to form the intent to commit a crime, nor was he able to understand the wrongfulness of his conduct. In rebuttal, the state called Dr. Zager. As part of her testimony concerning the defendant's state of mind and his ability to remember the events of the shooting, she repeated what the defendant told her that he remembered of the shooting.

> I remember being at the house. I walked passed [sic] the front door. I could see in the living room that there was no one there. I looked in the window on the bucket and I saw someone in bed in the dad's bedroom. I went to the back and I was pulling on the screen door to open it, and that's when the gun went off. It shot through the window in the door, and then I tried to open the door and it was locked, so I tried to shoot the lock off the door.

It is this testimony of which the defendant complains. The defendant's statement is a prior inconsistent statement of his trial testimony and was used to impeach him. The defendant testified at trial that he only remembered shooting the door to open it. He did not remember firing through the window and he did not remember checking to see if the door was locked. The defendant's prior statement also tends to rebut his claim of diminished capacity because, for instance, the statement recounts a logical, detailed version of events. Accordingly, we conclude that Dr. Zager's testimony was admissible, and it comports with <u>Huskey</u> and <u>Martin</u>; it was given by the doctor in relation to her opinion regarding the defendant's memories, which was relevant to the issue of the defendant's memory and mental state at the time of the shooting. Accordingly, this issue has no merit.

*b. Closing Argument*

The defendant complains of prosecutorial misconduct in closing argument when the district attorney argued elements not required for the offense, made references to facts not in evidence, used sarcasm, and made improper comments. Generally, counsel for both the state and the defendant are permitted wide latitude in arguing their cases to the jury. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Arguments must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law. State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999).

To prevail on a claim of prosecutorial misconduct, the defendant must show that the argument was so inflammatory or the conduct so improper that it affected the verdict to his detriment. See Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). On appellate review, this court should

"consider several factors including the intent of the prosecutor, the curative measures which were undertaken by the court, the improper conduct viewed in context and in light of the facts and circumstances of the case, the cumulative effect of the remarks with any other errors in the record, and the relative strength or weakness of the case."

Gray, 960 S.W.2d at 609. In addition, we must keep in mind that closing argument is subject to the trial court's discretionary control. Middlebrooks, 995 S.W.2d at 557.

In the case at bar, the district attorney argued that second degree murder was the knowing killing of another. He asked the jury, "Did Jason Beeler knowingly shoot that gun, knowing that the likely result could be the killing of Jamie Boane?" The defendant objected to this definition of second degree murder, claiming that second degree murder requires intent. The trial court stated that if an intentional killing is shown, a knowing killing is also shown. The trial court permitted the district attorney to continue; however, it first instructed the jury that the trial court will instruct the jury as to the law and that if either attorney argues anything that conflicts with those instructions, then the jury is to disregard the attorney's description of the law. We see no prosecutorial misconduct here. First, the district attorney properly stated the law because second degree murder is a knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1) (1997). Second, the trial court gave a curative instruction that the jury is to receive instructions on the law solely from the trial court. The jury is presumed to follow the instructions of the trial court. State v. Nesbit, 978 S.W.2d 872, 894 (Tenn. 1998).

The defendant also argues that the district attorney argued facts not in evidence when he described the defendant's actions immediately before the shooting. We disagree. The district attorney stated, "He had stalked – he had gone up to the house, cased the house, walked around, got a bucket, . . . looked into the bedroom window . . . observed who was in the house, went around back and pulled the phone lines and then shot two shots." The defendant testified that he did not remember pulling the telephone wires out of the connection box. The evidence showed, however, that the telephone worked shortly before the shooting and was not working minutes after the shooting. The evidence also showed that the wires had been pulled out of the telephone connection

box. Jeanne Beth testified that the defendant made her run out of the house to his car. A reasonable inference from this evidence is that the defendant pulled the telephone cables from the box before the shooting. Accordingly, this portion of the district attorney's argument was supported by the evidence and was not improper.

Last, the defendant argues that the district attorney made improper comments and used sarcasm several times in his closing. While discussing the testimony of Dr. Zager, the district attorney said that Dr. Zager had the information contained in the report by the defendant's psychologist, Dr. Monet. The district attorney said, "As you might imagine, Dr. Monet's opinion in his report is very long. You'd be surprised if it wasn't, I would imagine." In discussing the defendant's psychologist's testimony, the district attorney said, "Dr. Monet testified – and you heard [defense counsel] go back to the book he was referring to – that he was a level 10 on the GAF scale – *whatever the heck that is* – and that on level 10, a person is incapable of functioning, can't take care of personal hygiene – doesn't bathe? – I don't know." (Emphasis added). In discussing the defendant's conduct after the shooting and arguing that it showed that the defendant appreciated the wrongfulness of his conduct, the district attorney asked, "Is Dr. Monet saying that he was *just a blithering, incapable idiot* for just that one second when he shot the gun through the window, then after that, all of a sudden he was fine?" (Emphasis added).

The standard of review in determining whether counsel was allowed too much latitude during closing argument is abuse of discretion. Closing arguments must be temperate; they must be predicated on evidence introduced during the trial of a case, and they must be pertinent to the issues being tried. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). "Based in great measure upon the role of the prosecutor in the criminal justice system, the most restrictions are placed on the state." State v. Hall, 976 S.W.2d 121, 158 (Tenn. 1998). It is the state's responsibility to "refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence of issues at trial." Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995).

Depending on the context, sarcasmous rhetoric may be a legitimate and persuasive element of closing argument. This court has recognized that attorneys may employ "oratorical emphasis in arguing their respective positions." State v. Prince, 713 S.W.2d 914, 918 (Tenn. Crim. App. 1986). Such oratorical emphasis can "include the use of irony and sarcasm *for the purpose of making relevant points*." State v. Sledge, (Tenn. Crim. App. 1997) (emphasis added).

We believe that the prosecutor's argument about which the defendant complains in this case was based upon relevant considerations, and it addressed a pivotal defense theory of the case. The statements by the district attorney, we also conclude, were not so inflammatory as to rise to the level required for prosecutorial misconduct. Nevertheless, we do note that the third comment ("just a blithering, incapable idiot"), while not rising to the level to affect the verdict to the defendant's detriment, approaches the limit of temperate argument, and prosecutors would be well advised to avoid characterizations verging on name calling. See generally State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991) (name calling by prosecutor is improper).

*IV. Jury Instructions*

*a. Lesser Included Offenses for Felony Murder*

*(1) Lesser-included Offense Determination*

The defendant complains that the trial court erred by not instructing the jury on the lesser-included offenses for felony murder. Tennessee Code Annotated section 40-18-110(a) (1997) provides that a trial court must charge the jury with all lesser offenses included in the indictment, without any request on the part of the defendant to do so.

In this case, the defendant did not request jury instructions on lesser-included offenses for felony murder. Section 40-18-110(a), however, places an affirmative duty on a trial court regardless of whether the defendant made the request. Whereas the failure to object at trial to an omission in the jury charge usually results in waiver of the issue, see Tenn. R. Crim. P. 30(a)(b); State v. Cravens, 764 S.W.2d 754 (Tenn. 1989), section 40-18-110(a) carves out an exception for instructions on lesser-included offenses.

Nevertheless, Rule 3 of the Tennessee Rules of Appellate Procedure still applies and is specific that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused, . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). The defendant in this case failed to include this issue in his new trial motion, although he has raised it on appeal. Therefore, as part of our consideration of the issues raised on appeal, we will ultimately consider whether any error in failing to charge the jury on lesser-included offenses constitutes plain error. See Tenn. R. Crim. P. 52(b).

In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), our supreme court revised the standards for determining lesser-included offenses. In the companion case of State v. Dominy, 6 S.W.3d 472 (Tenn. 1999), the court confirmed that it had overruled portions of the holding in State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), in which a distinction had been established between lesser grades or classes of offenses and lesser-included offenses. In Burns, the court adopted the following test for determining what constitutes a lesser-included offense:

An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67.

Once it is determined that an offense is a lesser-included offense, a two-step process is used to determine if the evidence justifies a jury instruction on the lesser-included offense:

First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469.

In the case at bar, the defendant was indicted for first degree premeditated murder and for felony murder in perpetration of a burglary. The trial court dismissed the charge of first degree premeditated murder, and on that count of the indictment the trial court charged the jury on the lesser-included offenses of second degree murder, voluntary manslaughter, reckless homicide, and

criminally negligent homicide.[3]  The trial court then instructed the jury on the second count of the indictment, which charged felony murder.  The trial court did not charge the jury on any lesser-included offenses for felony murder.  The jury convicted the defendant of reckless homicide on the first count and felony murder on the second count.

As an initial matter, we note that indictment in this case was returned by the Obion County grand jury in 1997.  Defendant was tried and convicted in 1998, and he appealed his convictions in early 1999, prior to the release of the supreme court's opinion on November 8, 1999, in Burns.  We find no impediment to the retroactive application of Burns to cases, such as this one, that are on direct appeal.  This court has too often applied the Burns test retroactively to seriously question its retroactive nature.  See, e.g., State v. Jumbo Kuri, No. M1999-00638-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Nashville, May 25, 2000).   Likewise, the supreme court recently afforded retroactive application to the Burns test in State v. Billy Joe Stokes, No. M1997-00083-SC-R11-CD (Tenn., Nashville, July 5, 2000), wherein that defendant's trial and direct appeal were concluded before Burns was decided.  Felony murder, as it is now and as it was at the time of the defendant's  actions in this case, is defined as follows:

> **39-13-202.  First degree murder.** – (a)  First degree murder is:
>
> (1)    . . .
>
> (2)    A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect [added by amendment in 1998] or aircraft piracy; . . .

Pursuant to subsection (b) of the first degree murder statute, "intent to commit the enumerated offenses or acts in [subdivision (a)(2)]" is required as a culpable mental state for a felony murder conviction.  Tenn. Code Ann. § 39-13-202(b) (1997).

Tennessee has only a single first degree murder statute.  See Tenn. Code Ann. § 39-13-202 (1997).  Premeditated murder, section 39-13-202(a), and felony murder, section 39-13-202(b), are not designated in our code as separate and distinct offenses but rather as alternative means by which criminal liability for first degree murder may be imposed.  See, e.g., Carter v. State, 958 S.W.2d 620, 624-25 (Tenn. 1997)  (holding both premeditated murder and felony murder are

---

[3]    We commend the trial court for instructing the jury in this manner, even though it failed to completely charge the lesser-included offenses for felony murder.  Although charging each count of the indictment individually with each of its lesser-included offenses may result in duplicate charges and much longer jury instructions, this method of charging should result in less confusion for the jury.  See State v. Franklin Howard, No. W1997-00047-SC-R11-CD, slip op. at 3 n.4 (Tenn., Jackson, July 6, 2000).

simply alternate means of committing the single crime of first degree murder); see also Schad v. Arizona, 501 U.S. 624, 640-41, 111 S. Ct. 2491 (1991) (concluding that most first degree murder statutes retain premeditated murder and felony murder as alternative means of satisfying the mental state requirement). This legal-equivalent concept has been explained in the following fashion:

> [I]t is not necessary that the State prove an intention to kill or that it was committed willfully, deliberately, premeditatedly and with malice aforethought. The statute supplies the elements necessary to a conviction of murder in the first degree. In other words, "*the premeditated intent to commit a felony or other criminal acts is, by implication of law, transferred from that offense to the homicide actually committed, so as to make the latter offense a killing with malice aforethought constituting murder in the first degree.*"

Farmer v. State, 296 S.W.2d, 879, 883 (Tenn. 1956) (emphasis in original). The perpetration of the felony, during which a homicide occurs, is the "legal equivalent" of the elements of first degree premeditated murder, State v. Beasley, 699 S.W.2d 565, 567 (Tenn. Crim. App. 1985) (citing Sullivan v. State, 173 Tenn. 475, 121 S.W.2d 535 (1938) (stating theories were "legal equivalent")), which is defined pursuant to section 39-13-202(a)(1) as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). This concept, sometimes referred to as transferred intent, remains embodied in our current felony murder statute, as evidenced by subsection (b) of our first degree murder statute, whereby the culpable mental state required for a felony murder conviction is the intent to commit the underlying felony. Tenn. Code Ann. § 39-13-202(b) (1997). Felony murder, therefore, requires a culpable mental state of intentional. As a result, it subsumes all the other recognized mental states. That is, criminal negligence is also established if a person acts recklessly, knowingly or intentionally; recklessness is also established if a person acts knowingly or intentionally; knowing is also established if a person acts intentionally. Tenn. Code Ann. § 39-11-301 (1997).

Within this framework, second degree murder is a lesser-included offense of felony murder under the (a) part of the Burns test, which looks to see if all the statutory elements of the lesser offenses are included with the elements of the charged offense. Second degree murder is a "knowing killing of another." Tenn. Code Ann. § 39-13-210 (1997). It differs from felony murder only in that second degree murder involves a "knowing" killing, a less culpable mental state than first degree murder. See Tenn. Code Ann. §§ 39-13-202(a)(2), -210(a)(1) (1997). Inasmuch as the culpable mental state of knowing is also established if a persons acts intentionally, part (a) of the Burns test is satisfied.

Voluntary manslaughter embraces "knowing" killings as well as "intentional" killings. Tenn. Code Ann. § 39-13-211(a) (1977). We believe that voluntary manslaughter meets part (a) of the Burns test because the better view is that "state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner" is not an element of voluntary manslaughter. Nevertheless, the supreme court stated in State v. Dominy, 6 S.W.3d 472 (Tenn. 1999), "that the 'passion' language in the definition of voluntary manslaughter simply reflects

-22-

a less culpable mental state than required for first or second degree murder." 6 S.W.3d at 479 n.9. Under that view, voluntary manslaughter qualifies as a lesser-included offense under part (b)(1) of the Burns test, which asks if the lesser offense fails part (a) only "in the respect that it contains a statutory element or elements establishing . . . a different mental state indicating a lesser kind of culpability." The questions whether reckless homicide and/or negligent homicide are lesser-included offenses of felony murder are easily answered in the affirmative. "Reckless homicide is a reckless killing of another." Tenn. Code Ann. § 39-13-215 (1997). It differs from felony murder only in that it involves a "reckless" killing, a less culpable mental state than first degree murder. See Tenn. Code Ann. §§ 39-13-215(a), -202(a)(2) (1997). Inasmuch as the culpable mental state of recklessness is also established if a person acts intentionally, reckless homicide is a lesser-included offense of felony murder under part (a) of Burns.

Criminally negligent homicide is defined as "criminally negligent conduct which results in death." Tenn. Code Ann. § 39-13-212 (1997). It differs from felony murder only in that it involves a "criminally negligent" killing, a less culpable mental state than first degree murder. See Tenn. Code Ann. §§ 39-13-212, -202(a)(2) (1997). Inasmuch as the culpable mental state of criminal negligence is also established if a person acts intentionally, criminally negligent homicide is a lesser-included offense of felony murder under part (a) of Burns.

*(2) Justification Analysis*

Having determined that second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony-murder, we must now resolve whether the evidence in this case justified an instruction on any or all of these lesser-included offenses pursuant to Burns's two-fold inquiry.

We conclude that when the evidence is viewed "liberally in the light most favorable to the existence of [second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide] without making any judgments on the credibility of such evidence," there was evidence that "reasonable minds could accept" as to those lesser-included offenses.[4]

More specifically, regarding the lesser-included offense of second degree murder, the defendant shot the lock off a closed door and then shot through a curtained window. This conduct resulted in the death of the victim, who was about to open the door. There was evidence that the house was well lit from the inside. When the evidence is liberally viewed as it relates to second-degree murder, a jury could reasonably conclude that the defendant either saw the victim through the partially opened curtain or saw the victim's shadow on the curtain, but, nevertheless, he chambered another shell in his pump action shotgun and shot through the window, striking the victim in the neck. Viewed in this manner, this evidence would be sufficient to show that the

---

[4] Regarding the first count of the indictment, the trial judge dismissed the first degree murder charge but submitted that count to the jury on second degree murder, reckless homicide, and criminally negligent homicide. The jury then convicted the defendant of reckless homicide on the first count.

defendant was aware that his conduct was reasonably certain to cause the victim's death. See Tenn. Code Ann. § 39-11-302 (1997) (definition of knowing); see generally State v. George Blake Kelly, No. 01C01-9610-CC-00448, slip op. at 7 (Tenn. Crim. App., Nashville, Oct. 13, 1998) (example of difference between reckless and knowing conduct; person firing from inside windowless building through open doorway who cannot see if anyone is present acts recklessly, while person who similarly acts but who is aware people are near open door acts at least knowingly). Accordingly, we conclude that it was error for the trial court to not instruct the jury on second degree murder as a lesser-included offense of felony murder.

Applying the two-step process for determining whether an instruction should have been given on voluntary manslaughter, we conclude that in this case, there was insufficient evidence of provocation. The evidence showed that the defendant parked his car away from the house and using a bucket as support, peered into a window before circling the house and shooting through the back door. The defendant testified to having a single-minded purpose of entering the house. Provocation was not shown, and accordingly, we conclude that an instruction on voluntary manslaughter as a lesser- included offense was not warranted by the facts adduced at trial.

As with second degree murder, the trial court's failure to charge reckless homicide and criminally negligent homicide as lesser-include offenses on the second count was error. The evidence, viewed liberally, supports the conclusion that the defendant's "disregard for" or his "failure to perceive" the risks of firing into the door of a residence, which was known by him at the very least to be occupied, constituted a "gross deviation from the standard of care that an ordinary person would exercise," such that he committed a reckless homicide or a criminally negligent homicide.

### *(3) Harmless Error Analysis*

The final question is how to assess the effect of the trial court's error in failing to instruct on second degree murder, reckless homicide, and criminally negligent homicide as lesser-included offenses of felony murder. The answer requires that we wade, once again, into the somewhat rancorous debate whether the error complained of is constitutional or nonconstitutional. If the error is constitutional, the burden shifts to the state to prove harmlessness beyond a reasonable doubt. The burden does not shift to the state for nonconstitutional error. See, e.g.,State v. Harris, 989 S.W.2d 307, 314-15 (Tenn. 1999); State v. Nichols, 877 S.W.2d 722, 742 (Tenn. 1994). Moreover, the standard for assessing the harm resulting from constitutional error is more exacting than the standard that applies to nonconstitutional error. Constitutional error will result in a reversal unless the reviewing court is convinced beyond a reasonable doubt that the error did not affect the outcome of the trial. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). By contrast, nonconstitutional error is not reversible unless the error affirmatively appears to have affected the result of the trial on the merits, or unless considering the record as a whole, the error involves a substantial right which more probably than not affected the judgment or resulted in prejudice to the judicial process. See, e.g., Harris, 989 S.W.2d at 315; Nichols, 877 S.W.2d at 742; see also Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

We have concluded in the present case that the error is reversible regardless of which standard of harmless error analysis is used. In other words, we hold that the defendant has affirmatively shown that the error "affected the result of the trial on the merits," Tenn. R. Crim. P. 52(a), and that "considering the whole record error involving a substantial right more probably than not affected the judgment," Tenn. R. App. P. 36(b). However, we realize that some panels of this court have taken the view that it is difficult, if not impossible, for a defendant, who is deprived of a justified instruction on a lesser-included offense, to carry the burden laid upon him by the above-quoted rules.[5] See, e.g., State v. Khanh V. Le, No. W1998-00637-CCA-R3-CD, slip op. at 17 (Tenn. Crim. App., Jackson, Mar. 9, 2000), perm. app. filed (Tenn. Apr. 13, 2000). Thus, in view of the possibility of our supreme court determining upon further appeal of this case that harmless error results from the use of the non-constitutional standard of analysis, we are constrained to explain our determination that a constitutional issue is at stake and that the Chapman standard for harmless error analysis applies to render the error reversible. Thus, we will first explain our holding that the non-constitutional standard results in reversible error, and then we will discuss the constitutional bases for requiring jury instructions as to applicable lesser-included offenses.

We are buttressed in our conclusion that the record reflects that the error, which does involve a substantial right, "more probably than not affected judgment," by the expert testimony concerning the defendant's mental state prior to and at the time of the shooting. Dr. Monet, the defense psychiatric expert, testified that at the time of the shooting the defendant was suffering from a severe major depression and was suicidal. According to Dr. Monet, there was "only room for one thought in his mind, and that's to kill himself before his wife, in front of her." Dr. Zager, who testified for the state as an expert psychologist, held the opinion that at the time of the shooting the defendant had a severe mental illness and that he was "in emotional distress and crisis." Dr. Zager agreed that the defendant's conduct in carrying the loaded gun was reckless. However, Dr. Zager further testified that in his opinion the defendant could understand and appreciate the wrongfulness of his action. Dr. Patel, the prosecution psychiatric expert, testified that in his opinion the defendant knew what he was doing; his intention was to get to his wife, and he would get rid of whatever resistance he might encounter.

The jury heard this conflicting expert testimony, and it reached its own determinations about credibility in this area. Yet, those determinations apparently led to the jury determining with regard to the first count of the indictment that the defendant is guilty only of the lesser-included offense of reckless homicide. While consistency in verdicts for multiple count indictments is unnecessary, e.g., Wiggins v. State, 498 S.W.2d 92, 93-94 (Tenn. 1973); State v. Gennoe, 851 S.W.2d 833, 836 (Tenn. Crim. App. 1992); State v. Hicks, 835 S.W.2d 32, 36 (Tenn. Crim. App. 1992), we cannot conclude with the slightest degree of confidence that had the jury also been

---

[5] Under this view the imperative for the lesser-included offense jury instructions is merely statutory. Section 40-18-110(a) of the Tennessee Code Annotated provides, "It is the duty of all judges charging juries in cases of criminal prosecutions for any felony wherein two (2) or more grades or classes of offense may be included in the indictment, to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." Tenn. Code Ann. § 40-18-110(a)(1997). This statute was first enacted by the Tennessee General Assembly of 1877. See, e.g., Good v. State, 69 Tenn. 293, 294 (1878).

instructed on any or all of the lesser-included offenses, with regard to the second count of the indictment, it would have eschewed all of the lesser-included offenses and convicted the defendant of felony-murder.

The testimony about the defendant's mental state was more cogent than typically encountered. Based upon this testimony and the first-count verdict, we conclude that, as to the second count, had the jury been allowed to consider second degree murder, reckless homicide, and criminally negligent homicide, as filtered through the expert testimony, the jury probably would have rejected felony murder in favor of one or more of these lesser-included offenses.

Now, we address the effect of the error viewed as a constitutional deprivation. Disconcert about how to assess the erroneous failure to charge lesser-included offenses derives from the supreme court's opinion in State v. Williams, 977 S.W.2d 101 (Tenn. 1998). In that case, the supreme court granted permission to appeal to consider whether the erroneous failure to instruct the jury on a lesser-included offense requires automatic reversal or whether it is subject to harmless error analysis. For our purposes in this case, it is helpful to examine the context in which the question was posed.

The state conceded in Williams that the failure to charge the lesser-included offense was error. See Williams, 977 S.W.2d at 104. The state argued that the error in failing to charge voluntary manslaughter, as a lesser-included offense, was "harmless beyond a reasonable doubt" because the jury convicted the defendant of first degree murder even though the jury was provided instructions on second degree murder and reckless homicide. See id. The defendant argued that an automatic reversal was required because the type of constitutional error that occurred could never be treated as harmless. See id. From these arguments, the parties in Williams were in agreement first, that error had occurred and second, that the error was constitutional. The positions of the parties differed *only* with respect to application of the harmless error analysis of Chapman v. California, 386 U.S. 18, 24 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

The Williams court held that a trial court's erroneous failure to charge on a lesser-included offense does not automatically result in reversal. That much is certain. Less certain, though, is how the court in Williams then determined the harmfulness of the error; that is, whether the error is constitutional or non-constitutional. At one point in its opinion, the court stated,

> Accordingly, we conclude that a trial court's erroneous failure to instruct on voluntary manslaughter is subject to harmless error analysis. Reversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice.

Williams, 977 S.W.2d at 105.

When, however, the Williams court articulated its holding in that case, it stated,

Accordingly, the trial court's erroneous failure to charge voluntary manslaughter is *harmless beyond a reasonable doubt* because the jury's verdict of guilt on the greater offense of first degree murder and its disinclination to consider the lesser-included offense of second degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter.

Id. at 106 (emphasis added).[6]

---

[6]  Since Williams, five approaches to harmfulness have emerged.

First, the error is harmless regardless whether the failure to instruct is scrutinized under the "harmless beyond a reasonable doubt" standard or under the nonconstitutional standard of affirmatively appearing to have affected the result of the trial or involving a substantial right which more probably than not affected the judgment. See State v. Robert Rainey, No. W1999-00692-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, Apr. 25, 2000), perm. app. filed (Tenn. June 13, 2000) ("Accordingly, we hold that the failure to charge the jury on reckless endangerment was harmless, whether viewed under Rule 36(b) of the Tennessee Rules of Appellate Procedure, Rule 52(a) of the Tennessee Rules of Criminal Procedure, or under the constitutional standard of beyond a reasonable doubt."); State v. Jerry Wayman Travis, W1999-01089-CCA-R3-CO, slip op. at 7, (Tenn. Crim. App., Jackson, Mar. 10, 2000) (cannot classify error as harmless under either constitutional or statutory standard); State v. Khanh V. Le, No. W1998-00637-CCA-R3-CD, slip op. at 14 (Tenn. Crim. App., Jackson, Mar. 9, 2000), perm. app. filed (Tenn. Apr. 13, 2000) (Woodall, J., concurring in part and dissenting in part); State v. Corey Lamar Campbell, No. 01C01-9805-CR-00215, slip op. at 12 (Tenn. Crim. App., Nashville, Sept. 9, 1999).

Second, the standard for assessing harmfulness is not discussed. See State v. Tambora N. Simmons, No. 03C01-9905-CR-00188, slip op. at 5 (Tenn. Crim. App., Knoxville, Feb. 16, 2000) ("Accordingly, the failure to instruct on simple possession, if found to be error, would be harmless."); Bobby Kenneth Nash v. State, No. 01C01-9810-CR-00423, slip op. at 3 (Tenn. Crim. App., Nashville, Jan. 27, 2000) (*per curiam* order denying rehearing),perm. app. denied (Tenn. June 5, 2000); State v. James Tyrone Harbison, No. 03C01-9808-CR-00271, slip op. at 4 (Tenn. Crim. App., Knoxville, Oct. 6, 1999), perm. app. denied (Tenn. April 10, 2000); State v. Antonio M. Kendrick, No. 02C01-9708-CR-00319, slip op. at 2 (Tenn. Crim. App., Jackson, Aug. 6, 1999) perm. app. granted (Tenn. Feb. 7, 2000); State v. Eric Flemming, No. 01C01-9709-CR-00418, slip op. at 12 (Tenn. Crim. App., Nashville, Jan. 20, 1999), aff'd 19 S.W.3d 195 (Tenn. 2000).

Third, both standards for determining harmless error are stated. See State v. Roger Dale Bennett, No. 01C01-9607-CC-00139, slip op. at 7 (Tenn. Crim. App., Nashville, Dec. 31, 1998), perm. app. denied (Tenn. May 13, 1999) (reversal is required only if error affirmatively appears to have affected trial result; in this case error harmless beyond a reasonable doubt).

Fourth, the erroneous failure to instruct is reviewed to determine if the error is harmless beyond a reasonable doubt. See State v. Jumbo Kuri, No. M1999-00638-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Nashville, May 25, 2000) ("[W]e conclude that the general rule is that the erroneous failure to instruct on a lesser-included offense is reversible error unless it is shown to be harmless beyond a reasonable doubt."); State v. Vincent C. Sims, No. W1998-00634-CCA-R3-DD, slip op. at 14 (Tenn. Crim. App., Jackson, Mar. 14, 2000) ("Accordingly, under Williams, any error in declining to give instructions on voluntary manslaughter and criminally negligent homicide would be harmless beyond a reasonable doubt."); State v. Curtis J. Ely, No. 03C01-9806-CC-00215, slip op. at 10 (Tenn. Crim. App., Knoxville, Nov. 4, 1999) (Wade, J., dissenting), perm. app. granted (Tenn. May 22, 2000) (error was not harmless beyond a reasonable doubt; burden on state to assure no impermissible invasion of jury's role); State v. Terry Proffitt; No. 03C01-9712-CC-00530, slip op. at 4 (Tenn. Crim. App., Knoxville, Jun. 2, 1999); State v. Raymond Hale; No.

Our review of the case law and constitutional guarantees persuades us that the erroneous failure to instruct on lesser-included offenses is constitutional error for which the state bears the burden of proving harmlessness beyond a reasonable doubt.

Fodder for the argument that Code section 40-18-110(a) is the only source for the right to an instruction on lesser-included offenses stems from an equivocal statement in Williams: "Moreover, though sometimes described as a constitutional right, in this State the right to instructions on lesser offenses actually derives from a statute, Tenn. Code Ann. § 40-18-110(a)(1997 Repl.)." Williams, 977 S.W.2d at 105. Also, in State v. Tina Swindle, ___ S.W.3d ___, No. M1998-00362-SC-R11-CD (Tenn., Nashville, Aug. 25, 2000), a case in which the defendant was charged with aggravated sexual battery, our supreme court held that the trial court erred when it failed to instruct the jury as to the lesser-included offense of the Class B misdemeanor assault defined as "intentional or knowing physical contact .. . . [which] a reasonable person would regard . . . as extremely offensive or provocative." Id. at ___, slip op. at 3; see Tenn. Code Ann. § 39-13-101(a)(3) (1997). The Swindle court initiated its analysis of the lesser-included offense issue by referring to Code section 40-18-110(a) as the mandate for the lesser-included offense instructions, and after finding error, it held that "[r]eversal is required [because] the error affirmatively affected the result of the trial, or . . . the error more probably than not affected the judgment to the defendant's prejudice." Id. at ___, slip op. at 5. The court made no reference to the Chapman standard for analyzing constitutional errors.

On the other hand, our supreme court has not unequivocally stated that Code section 40-18-110(a) is the *only* basis for entitlement to the instruction. Certainly, constitutional recognition

---

01C01-9712-CR-00564, slip op. at 5 (Tenn. Crim. App., Nashville, May 6, 1999); State v. Charles D. Mullins, No. 01C01-9709-CC-00388, slip op. at 13 (Tenn. Crim. App., Nashville, Apr. 21, 1999).

The fifth approach is that entitlement to a lesser-included instruction is only a statutory right, and error will not result in reversal unless it affirmatively appears to have affected the result. See State v. Antonio Smith, No.. W1999-01096-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Jackson, Apr. 20, 2000); State v. Harvey Phillip Hester, No. 03C01-9704-CR-00144, slip op. at 5 (Tenn. Crim. App., Knoxville, Mar. 22, 2000); State v. Khanh V. Le, No. W1998-00637-CCA-R3-CD, slip op. at 17 (Tenn. Crim. App., Jackson, Mar. 9, 2000), perm. app. filed (Tenn. Apr. 13, 2000) ("[W]e cannot conclude that the trial court's error affirmatively appears to have affected the result of the trial on the merits."); State v. Gary Lee Miller, No. M1998-00788-CCA-R3-CD, slip op. at 15 (Tenn. Crim. App., Nashville, Mar. 6, 2000) (Woodall, J., concurring); State v. Byron M. Edwards, No. 03C01-9812-CC-00436, slip op. at 6 (Tenn. Crim. App, Knoxville, Feb. 2, 2000); State v. Timothy M. Reynolds, Nos. 01C01-9809-CC-00365, M1998-00059-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Nashville, Jan. 7, 2000); State v. Lawrence J. Perreault, No. M1998-00492-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, Dec. 17, 1999); State v. Michael Jason Powers, No. M1998-00264-CCA-RD-CD, slip op. at 4 (Tenn. Crim. App., Nashville, Dec. 7, 1999); State v. Curtis J. Ely, No. 03C01-9806-CC-00215, slip op. at 12 (Tenn. Crim. App., Knoxville, Nov. 4, 1999)(Welles, J., concurring), perm. app. granted (Tenn. May 22, 2000); State v. Guy William Rush, No. 03C01-9805-CR-00193, slip op. at 9 (Tenn. Crim. App. Knoxville, Oct. 13, 1999), perm. app. granted (Tenn. Apr. 24, 2000); State v. Leslie R. Holt, No. 01C01-9804-CR-00188, slip op. at 2 (Tenn. Crim. App. Nashville, Mar. 11, 1999); State v. Brandon R. Patrick, No. 03C01-9712-CC-00548, slip op. at 3 (Tenn. Crim. App., Knoxville, Feb. 19, 1999); State v. Roger Dale Bennett, No. 01C01-9607-CC-00139, slip op. at 10 (Tenn. Crim. App., Nashville, Dec. 31, 1998) (Wade J., concurring), perm. app. denied (Tenn. May 13, 1999).

-28-

and statutory recognition of a right afforded citizens in this state are not mutually exclusive. Statutes should, can, and do reflect constitutional values, privileges and rights.

The constitutional underpinning for the right to an instruction on lesser-included offense is frequently identified simply as the right to trial by jury. Article I, section 6 of the Tennessee Constitution provides that "the right of trial by jury shall remain inviolate." Less than two months after the opinion in Williams was released, the supreme court in State v. Bolden, 979 S.W.2d 587 (Tenn. 1998), expressly recognized that "[o]ne purpose of the statute [§ 40-18-110(a)] is to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment." Bolden, 979 S.W.2d at 593. The court in Bolden cited Williams for the proposition that the "failure to instruct on a lesser offense, however, may be shown to be harmless beyond a reasonable doubt under some circumstances." Id.

Pre-Williams case law exists that recognizes that the failure to charge a lesser-included offense is a constitutional deprivation. E.g., State v. Curtis J. Ely, No. 03C01-9806-CC-00215, slip op. at 10 n.3 (Tenn. Crim. App., Knoxville, Nov. 4. 1999) (collecting and citing numerous cases before Williams that failure to charge lesser offense is a constitutional deprivation). Indeed, the supreme court previously had recognized the constitutional nature of the right. See e.g., Strader v. State, 362 S.W.2d 224, 230-31 (Tenn. 1962) (in capital case, failure to charge lesser-included offenses deprived defendant of a "fair trial").

In addition to the state constitutional right to a jury trial and perhaps the provision guaranteeing due process of law, see Tenn. Const. Art. I, § 8, serving as bases for instructing on lesser-included offenses, we are persuaded that there is another Tennessee constitutional source which has not been discussed in the cases since the disconcert over Williams began, namely Article VI, section 9 of the Tennessee Constitution.

"Tennessee is one of the states admitted to the Union early in the history of this country, and at a time when memories of colonial abuses were fresh in the minds of the citizenry." Farris v. State, 535 S.W.2d 608, 617 (Tenn. 1976)(Harbison, J., dissenting). Article VI, Section 9 of the Tennessee Constitution targets one such abuse. It commands, "The Judges shall not charge juries with respect to matter of fact, but may state the testimony and declare the law." This provision was part of the original Tennessee Constitution of 1796. Tenn. Const. of 1796, art. V, § V. Simply stated, this constitutional imperative means that the trial judge decides the law and that the jury decides the facts. The reason for the constitutional division of labor between the trial court and the jury was to counteract the practice of trial judges intimating their views of what the verdict of the jury should be.

> It was permissible at the common law for trial judges to express an opinion as to the credibility of a witness or as to the weight of certain evidence. Particularly did judges claim the right to sum up the evidence as a whole and express an opinion thereon. It was the intent of the framers of the constitution that this power which had been shamefully abused should be taken away from the judges. Hence the readiness of appellate courts to

reverse the judgment where the trial judge has disregarded this constitutional prohibition against charging, guiding, or instructing the jury regarding matter of fact.

J. Higgins & A. Crownover, Jr., Tennessee Procedure in Law Cases (A Treatise Setting Forth the Principles, Pleadings, Practice and Procedure in Lawsuits), § 1424, at 534-35 (1937).

In Ivey v. Hodges, 23 Tenn. 154 (1843), the impetus for this constitutional right was described in the following fashion:

This provision arose out of the jealousy, with which our ancestors always looked upon any attempt on the part of the courts to interfere with the peculiar province of the jury, the right to determine what facts are proved in a cause, and to put a stop to the practice of "summing up," which was considered a dangerous infraction of the trial by jury, and an invasion of their province, which is prohibited by express terms in this section of the Constitution.

23 Tenn. at 155-56. See Hooper v. State, 325 S.W.2d 561, 563 (Tenn. 1959)("[T]his Section was put in our Constitution to prohibit a practice of 'summing up' as was practiced in Great Britain."); Tyrus v. Kansas City, Ft. S. & M.R. Co., 114 Tenn. 579, 86 S.W. 1074, 1075 (1905); Warren v. State, 44 Tenn. 130, 135 (1867) ("This is a wise and sacred provision, placed in the fundamental law to guard and protect the right of trial by jury, and the courts cannot transcend it or disregard it.").

One of the earlier and better expositions of how this constitutional right is to be observed and is to be implemented is found in Poole v. State, 61 Tenn. 289 (1872). "It is also the duty of the [trial judge]," writes the supreme court in Poole, "to define in his charge all the offenses embraced in an indictment for this crime." The supreme court continued,

The jury is the exclusive judge of the facts, the Court is a witness to it of the law. When the jury has heard the facts, it is for it to say what offense, if any, has been committed against the law. However plain it may be to the mind of the Court that one certain offense has been committed and none other, he must not confine himself in his charge to that offense. When he does so he invades the province of the jury, whose peculiar duty it is to ascertain the grade of offense. However clear it may be, the Court should never decide the facts, but must leave them unembarrassed to the jury.

Poole, 61 Tenn. at 294. See State v. Odom, 928 S.W.2d 18, 32 (Tenn. 1996) (purpose of Article VI, § 9 is to preserve the jury's role as a finder of fact); Cleckner v. Dale, 719 S.W.2d 535, 542 (Tenn. Ct. App. 1986) (trial court's comments ran afoul of Article VI, § 9).

The significance of Article VI, Section 9 is further highlighted by its inclusion in the Tennessee Constitution in addition to the constitutional guarantee of Article I, Section 6 that "the right of trial by jury shall remain inviolate," the constitutional guarantee of Article I, Section 9 that "in all criminal prosecutions, the accused hath the right . . . in prosecutions by indictment or presentment, [to] a speedy public trial, by an impartial jury," and the constitutional guarantee of Article I, Section 19 that "the jury shall have a right to determine the law and the facts, under the direction of the court." Article VI, Section 9 is much more than constitutional overkill; the framers of the Tennessee Constitution correctly and prudently recognized that the right to trial by jury would be a hollow guarantee without the further constitutional protection against trial courts invading the jury's domain to determine what facts are proved.

When a lesser-included offense instruction is erroneously omitted, the jury's fact-finding role is usurped. In <u>Stevenson v. United States</u>, 162 U.S. 313, 323, 16 S.Ct. 839, 843 (1896), the Supreme Court explained,

> A judge may be entirely satisfied from the whole evidence in the case, that the person doing the killing was actuated by malice; that he was not in any such passion as to lower the grade of the crime from murder to manslaughter by reason of any absence of malice; and yet if there be any evidence fairly tending to bear upon the issue of manslaughter, it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime was murder or manslaughter.

<u>See</u> <u>Beck v. Alabama</u>, 447 U.S. 625, 100 S.Ct. 2382 (1980) (sentence of death may not be constitutionally imposed when the jury was not permitted to consider a verdict of guilt of a lesser-included noncapital offense and the evidence would have supported such a verdict); <u>see also</u> <u>Schad v. Arizona</u>, 501 U.S. 624, 647-48, 111 S.Ct. 2491, 2505 (1991) (aim of rule in <u>Beck v. Alabama</u> was "to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice"); <u>see also</u> <u>Little v. State</u>, 65 Tenn. 491, 496 (1873) (declining to instruct jury as to manslaughter held to be equivalent of telling jury that the defendant was guilty, if at all, of nothing less than second degree murder and was an invasion of the jury's "province").

We perceive no valid distinction between telling the jury that it is not receiving an instruction on lesser-included offenses and simply not giving a lesser-included offense instruction. In either event, the message to the jury is clear; in the trial court's opinion if the defendant is guilty, the crime cannot fall below whatever offense that is defined in the charge to the jury.

We are not suggesting that a violation of Article VI, Section 9 requires an automatic reversal of a defendant's conviction. Tennessee courts have applied the <u>Chapman</u> constitutional harmless error analysis to both state and federal constitutional errors. <u>See, e.g.</u>, <u>State v. Middlebrooks</u>, 840 S.W.2d 317, 347 (Tenn. 1992); <u>State v. Cook</u>, 816 S.W.2d 322, 326 (Tenn.1991). For a violation of Article VI, section 9, we believe that the error is reversible unless the state can demonstrate beyond a reasonable doubt that the error did not affect the outcome of the trial. We do

-31-

not perceive that our supreme court intended to diminish the earlier courts' use of Article VI, section 9. In our view, it mandates jury instructions as to lesser-included offense.

Regardless of the precise nature or number of constitutional provisions which establish the right, we believe the right has a constitutional basis, and we are persuaded that, in this case, the state has failed to show that the error is harmless beyond a reasonable doubt.

Having determined that prejudicial error occurred, we must now determine whether we should notice the error as plain error. Our test for analyzing plain error was developed in State v. Adkisson, 899 S.W.2d 626, 641-41 (Tenn. Crim. App. 1994). The supreme court in State v. Donald Ray Smith, — S.W.3d —, No. W1998-00156-SC-R11-CD (Tenn. 2000), adopted this test as providing "a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection." Id. Five factors are considered in evaluating plain error, they are:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

Adkisson, 899 S.W.2d at 641-42.

Based upon the concerns we expressed above in determining that the error was not harmless, we conclude that it is also plain error. Above we have reached conclusions which support the application of the first four Adkisson factors. We conclude, as well, that the fifth factor, that consideration of the error is necessary to do substantial justice, is equally applicable.

Accordingly, we consider the trial court's error in failing to instruct the jury as to the lesser-included offenses of felony murder, despite the omission of the issue from the motion for a new trial. The defendant's felony murder conviction on the second count of the indictment, therefore, must be reversed, and the case is remanded for a new trial on the second count.

*b. Instruction on Diminished Capacity*

The defendant complains that the trial court erred by not using his special instruction on diminished capacity. The requested instruction provided,

> In Tennessee, no person may be convicted of a criminal offense unless the culpable mental state required is proven beyond a reasonable doubt. Evidence which tends to prove or disprove the required mental state is relevant and generally admissible under Tennessee law. The defendant has introduced psychiatric testimony aimed at negating the requisite culpable

-32-

mental state. This psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect and not just a particular emotional state or mental condition. You shall consider the expert's psychiatric evidence solely for the purpose of negating the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried.

A trial court is not required to give special instructions when jury instructions are full, fair, and accurate statements of the law. State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997). The trial court's denial of a special request is not error where the trial court's instructions on a matter are proper. State v. Vann, 976 S.W.2d 93, 114 (Tenn. 1998). The question becomes whether the instructions given the jury were proper, in light of the diminished capacity evidence raised by the defendant.

Our supreme court recognized that "diminished capacity is not an enumerated defense under the 1989 revision of the criminal code." State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). However, the court also observed "that the negation of an element of a criminal offense is recognized as a defense in Tennessee." Id. (citing Tenn. Code Ann. § 39-11-203). Further, the court agreed with the conclusion "that a defendant's capacity to form the requisite mental state to commit an offense is an issue in criminal prosecutions because the general criminal law in Tennessee provides that '[n]o person may be convicted of an offense unless . . . [t]he culpable mental state required is proven beyond a reasonable doubt.'" Id. (quoting Tenn. Code Ann. § 39-11-201(a)(2)). Additionally, this court has often stated the rule that "diminished capacity is not a defense capable of excusing or defeating a criminal charge in Tennessee." State v. Grose, 982 S.W.2d 349, 353 (Tenn. Crim. App. 1997).

In Grose, the defendant was convicted of first degree murder, and he alleged that the state failed to prove that he had the requisite mental state because he introduced proof that he had consumed alcohol and drugs before shooting the victim. Id. at 352. This court found the evidence sufficient to support the conviction. Id. at 353. The state presented evidence showing the defendant's intent, and the jury resolved the question in favor of the state. Id. The defendant in Grose also complained that the trial court erred by not instructing the jury on diminished capacity. Id. Grose introduced evidence of his diminished mental abilities through both expert and nonexpert witnesses. Id. at 354. The trial court instructed the jury on the proper *mens rea* necessary to find Grose guilty of first degree murder. Id. This court held that the trial court did not have a duty to instruct the jury that the defendant's diminished capacity could be considered in determining whether he was capable of forming the necessary mental intent for first degree murder. Id.

This court held similarly in State v. Rutherford, 876 S.W.2d 118 (Tenn. Crim. App. 1993). Rutherford was mentally retarded, and this court determined that the effect that the "defendant's mental retardation would have on his ability to form the culpable mental state was just another circumstance for the jury to consider in determining if the defendant in fact possessed the

required mental state." Id. at 121. The trial court instructed the jury on the *mens rea* for second degree murder by charging it with the legal description of "knowing." Id. at 120. This court held that this instruction was proper and no further special instructions were necessary because of the defendant's mental condition. Id. at 121.

In the case at bar, the trial court essentially followed Tennessee Criminal Pattern Jury Instruction 42.22 in instructing the jury on considering evidence of mental state. The instruction given to the jury reads,

> The state must prove beyond a reasonable doubt the culpable mental state of the accused. Culpable mental state means the state of mind of the accused at the time of the offense. This means that you must consider all of the evidence to determine the state of mind of the accused at the time of the commission of the offense. The state of mind which the state must prove is contained in the elements of the offense(s) as outlined in these instructions [above][below].

> In this case, you have heard evidence that the defendant might have suffered from a mental [disease][defect][condition] which could have affected his capacity to form the culpable mental state required to commit a particular offense.

> If you find from the evidence that the defendant's capacity to form a culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of the offense to determine of which, if any, offense he is guilty.

The jury heard evidence of diminished capacity presented by the defendant, and it found that the defendant possessed the *mens rea* required to convict for each offense. Just as in Grose and Rutherford, the trial court in this case did not provide any special instructions regarding diminished capacity. Moreover, the special instruction that the defendant requested did not refer to "diminished capacity." The defendant never identifies in what respects the jury charge actually given was inferior to the special request. Accordingly, we conclude that the trial court's instruction of the law in this case was sufficient to incorporate the defendant's request. This issue is without merit.

*c. Mental Disease or Defect*

The defendant complains that the trial court erred by instructing the jury that a mental disease or defect by itself is not a defense. He argues that it would be a defense if the mental disease or defect caused him to not understand what he was doing or to not understand that what he was doing was wrong.

-34-

A trial court has a duty to give a complete charge of the law applicable to the facts of the case. Tenn. Code Ann. § 40-18-110(a); State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975). We must review the entire charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

In the case at bar, the defendant complains of the trial court's instruction on the affirmative defense for insanity. The instruction essentially followed Tennessee Criminal Pattern Jury Instruction 40.16(b). The instruction given to the jury reads,

> The Defendant has raised the defense that he was insane at the time of the commission of the offense.
>
> A person is not responsible for criminal conduct if, at the time of the commission of the acts constituting the offense, the person, as a result of a severe mental disease or defect, was unable to appreciate the wrongfulness of such person's acts. A mental disease or defect by itself is not a defense. The terms "mental disease or defect" do not include any abnormality manifested only by repeated criminal or otherwise anti-social behavior.
>
> The defendant has the burden of proving the defense of insanity. For you to return a verdict of not guilty by reason of insanity, the defendant must prove both of the following things by clear and convincing evidence:
>
> (1) [he][she] had a severe mental disease or defect at the time that the acts constituting the crime were committed; and
>
> (2) that as a result of this severe mental disease or defect he was not able to understand what he was doing, or to understand that what he was doing was wrong.

Section 39-11-501 of the Tennessee Code Annotated describes the "insanity" defense and provides that a defendant has an affirmative defense if,

> at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

-35-

Tenn. Code Ann. § 39-11-501(a) (1997).   In  the  case at bar, the defendant argues that the statement, "a mental disease or defect by itself is not a defense," is incorrect and misleading as compared to the language in section 39-11-501(a) that a "[m]ental disease or defect does not otherwise constitute a defense." We disagree.  Taken in context, this statement, in conjunction with the remainder of the instruction, is a proper statement of the law as specified in Code section 39-11-501(a) and is not misleading.  Accordingly, this issue has no merit.

*d. Written Instructions Given to the Jury had Portions Crossed Out*

The defendant complains that the written instructions given to the jury were totally confusing to the jury and prejudicial because, rather than retyping the instructions, the trial court crossed out inapplicable passages and sections.  The defendant argues that it would have been impossible, despite curative instructions, for the jury to ignore the marked through and crossed out passages. In support of this argument, the defendant relies upon Rule 30(c) of the Tennessee Rules of Criminal Procedure.

Rule 30(c) provides, "[E]very word of the judge's instructions shall be reduced to writing before being given to the jury."  Tenn. R. Crim. P. 30(c).  Failure to follow this rule, while error, is not reversible unless it more probably than not affected the judgment.  Tenn. R. App. P. 36(b); State v. Gorman, 628 S.W.2d 739, 740 (Tenn. 1982).  The form of the instructions is not as important as their content.  It is not error for part of the charge to be handwritten while the remainder is typewritten.  State v. Tyson, 603 S.W.2d 748, 754-55 (Tenn. Crim. App. 1980).  Our supreme court recognized in State v. Cravens, 764 S.W.2d 754 (Tenn. 1989), that the reversal in State v. Martin, 702 S.W.2d 560 (Tenn. 1985), was for the content of the instructions, not the form.  Cravens, 764 S.W.2d at 756 (holding that the form of the instructions, although not as clear as directed by Martin, did not warrant reversal).

Furthermore, the defendant did not object to the form of the instruction and agreed that a curative instruction should be given.  Without an objection or a special request tendered, issues regarding the form or fullness of jury instructions are ordinarily waived unless there is plain error. State v. Cravens, 764 S.W.2d 754, 756-57 (Tenn. 1989).

We have reviewed the written instructions that were provided to the jury in this case. This jury charge consists of a series of printed, pattern instructions that reference various sections of the Tennessee Criminal Pattern Jury Instructions.  On ten of the printed pages, the trial court crossed out certain language that consisted mostly of definitions and elements of the offenses that did not apply.  The trial court instructed the jury to ignore the crossed out sections.  The presumption is that the jury followed instructions given by the trial court.  See, e.g., Spicer v. State, 12 S.W.3d 438, 449 n.14 (Tenn. 2000); State v. Nesbit, 978 S.W.2d 872, 885 (Tenn. 1998).

There is no indication that the jurors in this case did not follow the instructions, and we see no prejudicial error.  We would, however, caution against such a practice in the future. Providing written instructions to the jury with blackened out portions is "risky" at best because

prejudicial material might be sent to the jury. See Santana v. State, 548 So.2d 293 (Fla. App. 4 Dist. 1989).

*V. Writ of Error Coram Nobis*

The defendant complains that the trial court erred by denying his petition for error *coram nobis* based on the recanted testimony of his former wife. A writ of error *coram nobis* is available to a defendant in a criminal prosecution. See Tenn. Code Ann. § 40-26-105 (1997); Newsome v. State, 995 S.W.2d 129, 133 (Tenn. Crim. App. 1998); State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). However, the writ is an exceedingly narrow remedy which is appropriate only when the defendant was not at fault for not presenting "newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn. Code Ann. § 40-26-105; Hart, 911 S.W.2d at 374.

In State v. Mixon, 983 S.W.2d 661 (Tenn. 1999), our supreme court addressed the writ of error *coram nobis*. The court agreed with this court's rule

> that a new trial should be granted upon the basis of newly discovered recanted testimony only if: (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

Mixon, 983 S.W.2d at 672-73 and n.17. On appeal, the judgment of the trial court will not be set aside absent an abuse of discretion. See Tenn. Code Ann. § 40-26-105; State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

In the case at bar, Jeanne Beth recanted her trial testimony at a post-trial evidentiary hearing. Her new testimony was that the homicide victim was going to the door to let the defendant into the house, that the defendant never threatened her or her daughter after he entered the house, and that she left the house with him voluntarily and freely. She said that the homicide victim's family exerted pressure on her to testify as she did during the trial. She denied that the defendant's family exerted pressure on her to recant her testimony.

The trial court, in a thoughtful, detailed order denying the writ, found that Jeanne Beth's testimony at the evidentiary hearing was not credible. The trial court relied upon the witness's statement made to the police hours after the incident and another statement made on the Tuesday following the Friday night incident. Both of these statements were found to be consistent with the witness's trial testimony and contradictory to her new testimony. The trial court surmised that the witness was asking the court to ignore the fact that "her husband had just killed a man in her

presence, that she was divorcing him, and that he was armed." Accordingly, we conclude that the trial court did not abuse its discretion in finding that the witness was not credible in her testimony at the evidentiary hearing or in denying the defendant's writ of error coram nobis.

## CONCLUSION

In summary, in this case it was reversible error on the felony murder charge to not instruct the jury as to the lesser-included offenses of second degree murder, reckless homicide, and criminally negligent homicide. We reverse the defendant's felony murder conviction and remand for a new trial on the felony murder count. In all other respects, we affirm the defendant's reckless homicide, aggravated burglary, and especially aggravated kidnapping convictions, for which the defendant is serving an effective, combined sentence of 20 years. Upon retrial of the felony murder count, any resulting conviction of felony murder or of a lesser-included offense will merge with the defendant's reckless homicide conviction.

_____

JAMES CURWOOD WITT, JR., JUDGE